959 F.2d 1039
 295 U.S.App.D.C. 35
 MATSON NAVIGATION COMPANY, INC., Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America, Respondents,
State of Hawaii, Department of Commerce and Consumer
Affairs, Division of Consumer Advocacy, Mr. Tobias
E. Seaman, Intervenors.
 No. 91-1176.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 14, 1992.
Decided March 27, 1992.
 
 [295 U.S.App.D.C. 37] Petition for Review of an Order of the Federal Maritime commission.
 Stephen T. Rudman, for petitioner.
 C. Douglas S. Miller, Attorney, Federal Maritime Commission, with whom Robert D. Bourgoin, General Counsel, and James F. Rill, Asst. Atty. Gen., John J. Powers, III, and Robert J. Wiggers, Attorneys, Dept. of Justice, were on the brief, for respondents.
 Tobias E. Seaman, pro se.
 Lawrence M. Reifurth was on the brief, for intervenor, State of Hawaii.
 Before: WALD, WILLIAMS and D.H. GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 WALD, Circuit Judge:
 
 
 1
 Petitioner Matson Navigation Company, Inc. ("Matson") seeks review of a Federal Maritime Commission ("FMC" or "Commission") order rejecting its General Rate Increase ("GRI") of 3.6 percent on commodities moving in Matson's Pacific Coast/Hawaii Trade. In approving a GRI of only 2.68 percent, the Commission found that Matson was entitled to a rate of return on rate base of 10.18 percent, rather than the 10.58 percent rate of return that Matson would have earned under its requested 3.6 percent GRI. Matson challenges the lower rate of return, arguing (1) that the Commission erred in concluding that Matson faced relatively less risk than the average U.S. manufacturing firm and (2) that a 10.18 percent rate of return is unreasonably low because it inhibits Matson's ability to attract capital and service its debt. Because we find that the Commission's order is neither arbitrary, capricious, nor unsupported by substantial evidence in the record, we deny the petition for review.
 
 I. BACKGROUND
 
 2
 Matson is a common carrier by water serving the trade between the United States mainland and Hawaii (the "Hawaii Trade" or "Trade"). Matson's rates for port-to-port service in the Trade are subject to regulation by the FMC pursuant to the Shipping Act, 1916, 46 U.S.C.App. §§ 801-842 (1988), and the Intercoastal Shipping Act, 1933 ("1933 Act"), 46 U.S.C.App. §§ 843-848 (1988). On January 5, 1990, Matson filed a GRI of 3.6 percent on commodities moving both eastbound and westbound in the Hawaii Trade. That increase became effective, subject to refund, on March 10, 1990.[1]
 
 
 3
 By order served March 9, 1990, the Commission initiated proceedings to determine whether the GRI was "just and reasonable" within the meaning of section 3 of the 1933 Act, 46 U.S.C.App. § 845 (1988). That order designated six issues for determination by the Commission, including "the calculation of the benchmark rate of return and the need for adjustments to account for current trends in rates of return, the cost of money and relative risk." Matson Navigation Co., Inc., Proposed Rate Increase [295 U.S.App.D.C. 38] of 3.6 Percent Between United States Pacific Coast Ports and Hawaii Ports (Docket No. 90-09) ("Matson Proceedings ") (Order of Investigation and Hearing) at 4. The rate of return to which Matson is entitled is the only issue raised by Matson's petition for review.[2]
 
 
 4
 The Commission's General Order 11 ("G.O. 11") provides that return on rate base will be the "primary standard" by which the Commission evaluates the reasonableness of rates filed in the domestic offshore trades. 46 C.F.R. § 552.1(b) (1991). Under this methodology, the Commission identifies the average rate of return on total capital earned by U.S. manufacturing corporations over an extended period of time. Id. § 552.6(d)(2)(ii).[3] This "benchmark" rate of return is adjusted, if necessary, to account for current trends in rates of return, the cost of money, and the relative risk of the carrier vis-a-vis the average U.S. manufacturing firm. Id. The resulting "adjusted benchmark" rate of return is then compared to the carrier's projected rate of return on rate base (under the carrier's proposed rate increase) for a specified "Test Year."[4] According to Matson's projections, a 3.6 percent GRI would yield a rate of return on rate base of 10.58 percent.
 
 
 5
 The Commission's Administrative Law Judge ("ALJ"), and later the full Commission, adopted Matson's figure of 11.93 percent as the proper benchmark rate of return. Neither the ALJ nor the Commission made an adjustment for current trends in the cost of money. While the ALJ found that no adjustment was required for current trends in rates of return, the Commission disagreed and adjusted the benchmark downward by 0.5 percentage points. Matson does not challenge either of these Commission decisions.
 
 
 6
 Matson does challenge, however, the Commission's adjustment to the benchmark for relative risk. The ALJ found that Matson faced relatively more risk than the average U.S. manufacturing firm; he therefore adjusted the benchmark upward by .75 to 1.00 percentage points. The Commission, however, disagreed, concluding that Matson faced less risk than the average U.S. manufacturing firm. It therefore adjusted the benchmark downward by 1.25 percentage points. Combined with the reduction of 0.5 percentage points for trends in rates of return, the reduction of 1.25 percentage points for relative risk yielded an adjusted benchmark rate of return of 10.18 percent,[5] 0.4 percentage points lower than the rate of return on rate base Matson would have earned had the 3.6 percent GRI been approved (i.e., 10.58 percent). The Commission thus approved a GRI of only [295 U.S.App.D.C. 39] 2.68 percent, the rate increase projected to yield a rate of return on rate base of 10.18 percent.[6]
 
 
 7
 Matson raises two arguments in challenging the Commission's rejection of the full 3.6 percent GRI (and its concomitant 10.58 percent rate of return on rate base). First, it argues that the Commission, in applying the G.O. 11 methodology, erred in lowering the benchmark on account of Matson's relative risk. Second, it argues that regardless of whether the Commission properly applied the G.O. 11 methodology, the rate the Commission approved was nonetheless "unreasonable" within the meaning of the 1933 Act because it is too low to enable Matson to service its debt and attract capital.[7]
 
 II. DISCUSSION
 A. Standard of Review
 
 8
 We must affirm the Commission's decision unless we find it arbitrary, capricious, an abuse of discretion, not in accordance with law or unsupported by substantial evidence in the record. 5 U.S.C. § 706 (1988). As this court has often noted, however, ratemaking is " 'an intensely practical affair' requiring the conversion of inexact data into exact rates or limits upon rates." Puerto Rico Maritime Shipping Auth. v. Federal Maritime Comm'n, 678 F.2d 327, 335 (D.C.Cir.), cert. denied, 459 U.S. 906, 103 S.Ct. 210, 74 L.Ed.2d 167 (1982) ("PRMSA ") (quoting Trans World Airlines, Inc. v. Civil Aeronautics Bd., 385 F.2d 648, 658 (D.C.Cir.1967) (Leventhal, J.), cert. denied, 390 U.S. 944, 88 S.Ct. 1029, 19 L.Ed.2d 1133 (1968)). In reviewing an agency's ratemaking proceeding we take cognizance of "both the difficulty of the task and the expertise of the agency performing it." Id. at 335. Thus, while we expect the agency to engage in reasoned decisionmaking in approving a final rate, id. at 336, we also accord it "generous dollops of judgment" in evaluating the record to arrive at the "just and reasonable" rate. Trans World Airlines, 385 F.2d at 658.
 
 
 9
 Indeed, we have been especially deferential in reviewing FMC ratemaking proceedings. For Congress has mandated strict time limits on the Commission's decisionmaking process for general rate increases. The initial hearing before the ALJ must be completed within 60 days; an initial decision must be rendered within 120 days; and the Commission's final decision must be issued within 180 days from the date the new rate is scheduled to go into effect. 46 U.S.C.App. § 845(b) (1988).[8] These time limits represent a conscious congressional policy in favor of expedited action on rate filings by the Commission, see PRMSA, 678 F.2d at 336, and, accordingly, entitle the Commission to an extra portion of deference in the review of its rate orders. Id. As we noted in the PRMSA decision:
 
 
 10
 An order by Congress to consider a matter expeditiously is not a mandate to be arbitrary, capricious, irrational or sloppy. But strict time frames within which to work may require an agency to make its decision on a record more slender than desired and may render acceptable an unusually terse explanation of reasoning.
 
 
 11
 Id.
 
 
 12
 In sum, while we must still examine the Commission's conclusions with care to ensure that they are reasonable and grounded in the record, "he who would upset the rate order ... carries the heavy burden of making a convincing showing that it is [295 U.S.App.D.C. 40] invalid because it is unjust and unreasonable in its consequences." Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944).
 
 
 13
 B. The Commission's Downward Adjustment for Relative Risk
 
 
 14
 "[T]he adjustment for risk," the Commission properly stated, "has to do with the riskiness of the regulated carrier in the Test Year vis-a-vis that of the typical U.S. corporation." Matson Proceedings (Order Partially Adopting Initial Decision) ("Order") at 42:
 
 
 15
 If the perception is that an investment in the regulated carrier would be riskier than one in the average U.S. manufacturing firms making up the benchmark, the benchmark should be adjusted upward to assure that the regulated carrier could maintain a credit rating and attract capital.
 
 
 16
 Id.
 
 
 17
 In evaluating Matson's relative risk vis-a-vis the average U.S. manufacturer, the Commission, focusing primarily on Matson's competitive position in the Trade, made three basic findings. First, the Commission found that Matson's competitive position was unlikely to be affected greatly by its competitor Sea-Land Service, Inc.'s ("Sea-Land") announced expansion in the Hawaii Trade. Id. at 45. Second, the Commission determined that the Hawaii Trade is not a contestable market--i.e., there are substantial barriers that limit competition in the Hawaii Trade--and that therefore Matson is sheltered from competition to a greater degree than other corporations. Id. at 47. Finally, taking these two critical factors into account, the Commission examined the risk faced by the average U.S. manufacturer and concluded that Matson is less risky than such firms. Id. at 49. Matson challenges each conclusion as not supported by substantial evidence in the record. It also argues that the Commission's reduction for relative risk is arbitrary and capricious in that it is inconsistent with prior decisions in which the Commission either granted Matson an upward adjustment for risk or made no adjustment to the benchmark at all.
 
 
 18
 1. Sea-Land's Announced Expansion in the Hawaii Trade
 
 
 19
 Sea-Land, the only other operator of self-propelled vessels in the Trade, has been providing weekly service from the West Coast to Hawaii since 1987. Id. at 43. At the time Matson filed its rate increase, Sea-Land had approximately 21 percent of the Hawaii westbound container market and Matson a healthy 75 percent market share. Id. at 49. In May 1990, after Matson filed its rate increase but before the ALJ rendered his initial decision, Sea-Land announced that it would double its capacity to Hawaii in the last quarter of 1990 (the third quarter of the Test Year). Id. at 43.
 
 
 20
 The Commission assumed that Sea-Land would proceed with its announced expansion in the Trade. Id. at 44. It was unconvinced, however, that Sea-Land would be able to fill its additional capacity to Hawaii by wresting cargo away from Matson during the remainder of the Test Year. The Commission recognized that Sea-Land had certain cost advantages that would enable it to price on an "incremental" or marginal basis and thereby undermine Matson's rates,[9] but concluded that Sea-Land had [295 U.S.App.D.C. 41] not engaged in such rate competition in the past and was not likely to do so in the future. The Commission concluded that instead of engaging in fierce price competition with Matson, Sea-Land was more likely to follow Matson's price leadership and compete primarily on the basis of service. Moreover, the Commission found that even if Sea-Land is ultimately successful in filling its additional capacity at Matson's expense, "Matson may be expected to continue to carry half of the westbound cargo in the Trade and most of the eastbound cargo." Id. at 45.
 
 
 21
 Matson contests these conclusions, pointing to record evidence suggesting that Sea-Land has taken advantage of its cost advantages over Matson and priced on an incremental basis in the past. As to Sea-Land's future pricing behavior, Matson argues that "it makes economic sense" for Sea-Land to try and wrest cargo from Matson by undercutting Matson's rates and that the Commission, in concluding that Sea-Land will not engage in such rate competition, has substituted its business judgment for that of Sea-Land's. Matson also challenges the Commission's focus on the Test Year, arguing that regardless of whether the actual competition materializes late in the Test Year or beyond, investors during the Test Year will perceive the potentially increased risk facing Matson due to Sea-Land's announced expansion. Any potential or even current investor, Matson argues, will not ignore the competitive threat posed by Sea-Land simply because it is not expected to have dramatic effects within the narrow confines of the Commission's Test Year. Reply Br. at 4.
 
 
 22
 Matson's arguments are not without force. Were it legitimate for us to assess, in the first instance, the impact on Matson of Sea-Land's announced expansion in the Hawaii Trade, we might have reached a different conclusion from the Commission. In reviewing the Commission's rate order, however, we do not lightly substitute our judgment for that of the Commission's; our more modest task is to ensure that the Commission has diligently and rationally exercised its ratemaking authority. See Permian Basin Area Rate Cases, 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968) (court's role is not to supplant Commission's balancing of relevant interests affected by rate order, but to ensure that Commission has given reasoned consideration to pertinent factors affecting its decision). On the record before us, as we discuss below, we are unable to say that the Commission has failed to meet that obligation in its evaluation of Sea-Land's announced expansion in the Hawaii Trade.
 
 
 23
 a. Sea-Land's Past Pricing Behavior
 
 
 24
 Matson asserts first that Sea-Land has demonstrated a willingness to engage in incremental pricing in the past. Yet the only record evidence it cites is testimony that Sea-Land's rates for Freight All Kinds ("FAK") shown in a particular ICC tariff are 4.5 percent less for a standard 40-foot container, 5 percent less for a high cube 40-foot container, and 6 percent less for a 45-foot container than Matson's rates for the same size containers. Although we are told that as a general matter FAK has been a leading commodity for Sea-Land in recent years, we are unable to discern from the record to what degree this single example of lower rates on three types of containers demonstrates that Sea-Land engages in incremental pricing as a general rule or even selectively on critical items.[10] Because Matson bore the burden of proof before the Commission, see 46 U.S.C.App. § 845(b) (1988), we cannot assign error to its finding that this evidence "does not [295 U.S.App.D.C. 42] establish that Sea-Land is pricing on an incremental basis." Order at 45 n. 12.
 
 
 25
 b. Sea-Land's Future Pricing Behavior
 
 
 26
 Predicting Sea-Land's future pricing behavior obviously calls for an exercise of judgment. Matson's expert testified that Sea-Land would surely take advantage of its pricing advantage by engaging in incremental pricing on cargo moving westbound to Hawaii, thereby undercutting Matson's westbound rates and wresting cargo away from Matson. In contrast, Robert Blair, an expert testifying on behalf of the Commission's Hearing Counsel, testified that Sea-Land
 
 
 27
 regularly follows Matson's price leadership ... because it makes more sense in a clearly defined, growing, entry-blockaded trade to charge prices comparable to the dominant firm than to try to use a potential pricing advantage to initiate a price war (that would lower both firms' profits) with a long-time incumbent who has higher frequency of service, 75 percent or more of the market, and a monopoly on the eastbound half of the trade. It's more profitable (and reasonable) to come to a modus vivendi that allows the two main players to keep rates high and compete mainly on service offered (or, if possible, to divide the market).
 
 
 28
 Testimony of Robert M. Blair (Apr. 9, 1990) at 41. Some credence is lent to Blair's testimony by the fact that Sea-Land filed a general rate increase of 3.6 percent on the heels of Matson's proposed GRI, see Matson Proceedings (Initial Decision) at 140, although Sea-Land's rate increase is of course not necessarily inconsistent with Sea-Land's future adoption of a competitive pricing strategy. As counsel for Matson explained at oral argument, Sea-Land may adhere to Matson's general rate structure, but may also selectively price-cut, as Matson claims it has done on certain FAK commodities, on lucrative commodities such as beer and temperature-controlled and refrigerated vegetables. Transcript at 17.
 
 
 29
 The Commission considered this competing testimony, Order at 44-45, and, ultimately, sided with Blair. Whatever skepticism we may have as to Sea-Land's protracted willingness to follow Matson's price leadership and compete primarily on the basis of service, resulting in a more gradual utilization of its expanded capacity--Sea-Land is doubling its carrying capacity in a trade where expected growth is estimated at less than 4.0 percent in the Test Year--we are ultimately not able to say that the Commission has acted unreasonably in its pick among predictions. The competitive scenario outlined by Blair is plausible and the Commission certainly could rely on that testimony in determining that Sea-Land's announced expansion did not inevitably signal an immediate outbreak of price warfare between the two shipping concerns. See, e.g., PRMSA, 678 F.2d at 344 (approving Commission's crediting of testimony of one among several conflicting experts); see also D.C. Transit Sys., Inc. v. Washington Metro. Area Transit Comm'n, 466 F.2d 394, 414 (D.C.Cir.), cert. denied, 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972) (upholding agency's reliance on expert testimony; stating that "credibility determinations within the agency's sphere of expertise are peculiarly within its province, and courts will upset them only if made irrationally").[11]
 
 
 30
 c. The Commission's Focus on the Test Year
 
 
 31
 Nor do we think that the Commission ignored the current effect on Matson's relative [295 U.S.App.D.C. 43] risk of the future enhancement of competition that would attend the realization of Sea-Land's new capacity in the latter part of the Test Year and beyond. First, as noted above, the Commission found that even if Sea-Land is ultimately successful in wresting cargo from Matson, Matson will still have a commanding presence in the Trade. The Commission thus did take account of the long-term effects of Sea-Land's announced expansion; it simply did not agree that an expansion by Matson's sole competitor which would still leave Matson with over 50 percent market share warranted a conclusion that Matson was more risky than the average American manufacturing firm. Second, the Commission in fact rejected Hearing Counsel's recommendation that the benchmark be adjusted downward by 1.75 percentage points, concluding that such a large reduction failed "to give adequate weight to Matson's increased competition from Sea-Land." Order at 49. While obviously a more elaborate explanation by the Commission would have been helpful on this tricky issue, it appears evident to us that the Commission did consider both the short-term and long-term competition from Sea-Land in its conclusion that Sea-Land's announced expansion did not render Matson more risky than the average U.S. manufacturing firm. Cf. Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (court can uphold "a decision of less than ideal clarity if the agency's path may reasonably be discerned").
 
 
 32
 While the Commission's assessment of an expanded Sea-Land's potential impact on Matson's fortunes is neither flawless nor finely tuned, we believe it is supported by substantial evidence in the record. Its expert judgment on this question should not be upset.
 
 
 33
 2. The Hawaii Trade as an Uncontestable Market
 
 
 34
 The Commission also considered evidence on the contestability of the Hawaii Trade in order to determine whether Matson is more or less sheltered from competition than the manufacturing firms with which it is to be compared. Experts for both Matson and the Commission agreed that a contestable market is one in which (1) entry is possible with little or no sunk investment, (2) exit is cost-free or nearly so, and (3) there are no legal or regulatory barriers to entry or exit. Focusing primarily on the third factor, the Commission concluded that the Hawaii Trade is not a contestable market because there are "significant legal and regulatory barriers to entry." Order at 47.
 
 
 35
 The Commission pointed to the long delay in processing American President Line, Ltd.'s ("APL") application to enter the Trade[12] as evidence that there are considerable regulatory obstacles inhibiting entry into the Trade by carriers that receive federal operating-differential subsidies ("ODS") and who must therefore apply for permission to enter the domestic trades.[13] The Commission recognized that there are no regulatory barriers to carriers operating U.S.-flag, U.S.-built vessels that either receive no subsidies, or receive only construction-differential subsidies ("CDS"),[14] but found that there are at most[15] only eleven unsubsidized vessels in the entire U.S. shipping fleet, id. at 47 & n. 14, and that Matson had not demonstrated that any of [295 U.S.App.D.C. 44] the additional CDS-vessels were in fact suitable for the Trade. Id. at 47.
 
 
 36
 Matson does not challenge the Commission's conclusion that there are substantial regulatory barriers that preclude easy access to the Trade by carriers operating ODS-vessels. Rather, Matson directs its fire at the Commission's purported dismissal of its evidence that there are a substantial number of unsubsidized and CDS-vessels available to the Trade. In particular, Matson asserts that it provided the Commission with a list of vessels presumptively available to the Trade, but that the Commission improperly shifted the burden onto Matson to demonstrate which, if any, of those ships was in fact suitable for the Trade. Reply Br. at 10.
 
 
 37
 Matson's characterization of the Commission's stance on "available" vessels is not entirely accurate. The Commission clearly did consider the extent to which the existence of eleven unsubsidized, U.S.-flag vessels theoretically available for use in the Trade affected the question of whether the Hawaii Trade is a contestable market. While Matson relied on their existence to demonstrate the relative openness of the Hawaii Trade, the Commission concluded that in light of the several domestic offshore trades potentially vying for their participation, eleven ships was too small a number to rebut its basic finding that the Hawaii Trade was not a contestable market. See Order at 47 n. 14. And while Matson is correct that the Commission did not engage in any detailed analysis with regard to the availability or suitability of thirty-one CDS-vessels that could theoretically enter the Trade by repaying past subsidies, ultimately we find no error in the Commission's placing the burden of demonstrating their suitability or availability on Matson. See 46 U.S.C.App. § 845(b) (1988) (noting that carriers bear the burden of proof before the Commission).
 
 
 38
 No bright lines distinguish a contestable from a non-contestable market. The Commission made a judgment from the evidence discussed above that the Hawaii Trade is not a contestable market. We see no basis for upsetting the Commission's determination.
 
 3. Other Indicia of Risk
 
 39
 Finally, the Commission examined the nature and the extent of the risk faced by the average U.S. manufacturer, concluding that such a prototype firm was a more risky enterprise for investors than Matson. Order at 49. The Commission found that Matson's 75 percent market share was greater than that enjoyed by the average U.S. manufacturing firm; that even with Sea-Land's doubling of its fleet, Matson will remain the dominant carrier in the Trade; that Matson was a price leader in a well-defined, predictable, growing market; that Matson, unlike the average U.S. manufacturer, is shielded from foreign competition by the Jones Act;[16] and, finally, that Matson's Aaa credit rating is better than that of the average U.S. manufacturing firm. Id. at 49.
 
 
 40
 Matson raises both substantial evidence and legal challenges to the Commission's determination that it is not as risky as the average U.S. manufacturing firm. Matson's expert testified that its rate of return was more vulnerable to a loss of business than that of a manufacturing firm,[17] that it could not stockpile production in slow periods, that it was committed to a single product, and that it does not have access to foreign markets or labor. In contrast, Hearing Counsel's expert Blair, after consulting the U.S. Industrial Outlook 1990: [295 U.S.App.D.C. 45] Prospects for Over 350 Industries[18] and other data compiled by the Department of Commerce, as well as conferring with an international statistics expert from the National Association of Manufacturers, testified that during the Test Year U.S. manufacturing firms will face more foreign and domestic competition than Matson, that Matson's legal and regulatory protections will be greater than those afforded to U.S. manufacturing industries, and that Matson's market dominance will exceed that of any American firm of which he was aware, including AT & T and IBM. Disagree as it may with Blair's assessment, Matson must concede that his testimony provides substantial record evidence upon which the Commission could rely in concluding that Matson was less risky than the average U.S. manufacturing firm.[19]
 
 
 41
 Matson's legal challenges are equally unavailing. Matson alleges that the Commission erred as a matter of law in relying on Blair's testimony that Matson was less risky than "a minor firm in a multi-member less concentrated market" as opposed to the "average U.S. manufacturing firm," the comparison mandated by G.O. 11. Pet. Br. at 47. Matson argues that "a minor firm in a multi-member less concentrated market" is a new, undefined entity against which Matson was improperly compared.
 
 
 42
 We disagree. The offending language appeared on a chart prepared by Blair that compared Matson with a so-called "Typical Manufacturer, Inc." on a number of features related to business risk. When viewed in context,[20] the phrase clearly describes the typical manufacturer's market position; Blair did not substitute a new, undefined entity for the "average U.S. manufacturing firm" that is the proper reference for assessing a carrier's risk.
 
 
 43
 Matson also alleges that in evaluating the level of risk facing the average U.S. manufacturing firm, Blair impermissibly relied on sources other than the Bureau of Census Quarterly Financial Reports (the "QFR"), the source of earnings information used in determining the unadjusted benchmark rate of return.[21] We agree that in [295 U.S.App.D.C. 46] determining whether to adjust the benchmark rate for relative risk, the Commission should, ideally, make a direct comparison of the risks faced by Matson with those faced by the firms in the benchmark group. Unfortunately, however, ratemaking rarely lends itself to such precision. As the Commission points out, the QFR does not contain data on import penetration, market concentration, forecasts of economic growth, and other information that is relevant to an assessment of relative risk. Resp. Br. at 27 n. 15. Again, Matson may, as it did, see Surrebuttal Testimony of George M. Jones (Exhibit S) (May 21, 1990) at 6-9, dispute Blair's analysis and conclusions regarding Matson's risk vis-a-vis that of the average U.S. manufacturing firm, but we do not believe that the Commission committed legal error in relying on risk assessment testimony that was informed by sources other than the QFR.
 
 
 44
 4. The Commission's Alleged Change in Policy
 
 
 45
 In making a downward adjustment for relative risk, the Commission recognized it was deviating from its prior Matson rate investigations in which the Commission either approved an upward adjustment for relative risk or made no risk adjustment at all. Matson Navigation Co., Inc.--Proposed Rate Increase, 21 F.M.C. 532 (1978) (upward adjustment for relative risk); Matson Navigation Co., Inc.--Proposed Rate Increase, 21 F.M.C. 538 (1978) (same); Matson Navigation Co., Inc.--Proposed Rate Increase, 23 SRR 155 (1985) (same); Matson Navigation Co., Inc.--Proposed Rate Increase, 23 SRR 1216 (1986) (no risk adjustment). However, the evidence presented in the prior rate investigations differed from the evidence presented in this one. In particular, the parties in previous cases had submitted evidence regarding Matson's historical variability of earnings[22] and business leverage[23], both of which tended to show that Matson was relatively more risky than comparable U.S. firms. In this proceeding, in contrast, no evidence was submitted on these aspects of risk; rather, considerable evidence was adduced regarding the Jones Act restrictions on potential competition in the Trade, evidence which tended to show that Matson was a relatively less risky enterprise than the typical U.S. manufacturing firm. Order at 50-52.
 
 
 46
 The Commission in this case, as in those before, evaluated the evidence before it and made a reasoned determination on the basis of that evidence as to an appropriate adjustment for relative risk. That different evidence in different cases produced different results certainly does not warrant the conclusion that the Commission has arbitrarily changed its policy or approach to assessing relative risk.
 
 
 47
 Based on its analysis of the three aspects of Matson's relative risk just discussed, the Commission found that a reduction in the benchmark of 1.25 percentage points was [295 U.S.App.D.C. 47] warranted.[24] The Commission's analysis and conclusion as to each area is supported by substantial evidence in the record. Having said that, we see no basis, nor does Matson suggest one, upon which to upset the Commission's determination that 1.25 percentage points, as opposed to some other figure, is the appropriate level of reduction for relative risk. We therefore find that the Commission properly applied its comparative earnings methodology and has arrived at a "reasonable" rate of return within the meaning of the 1933 Act.
 
 
 48
 C. A Capital Attraction Check on the Comparative Earnings Approach
 
 
 49
 Although G.O. 11 prescribes the use of the comparative earnings test as the "primary standard" for determining whether a carrier's rates are "just and reasonable," the ALJ and the Commission permitted Matson to submit evidence regarding its ability to attract capital. The Commission, perceiving Matson to be making a constitutional argument, agreed that it could not
 
 
 50
 direct a rate of return which is so low that the regulated carrier cannot attract equity capital. To do so would result in 'confiscatory' rates and would be contrary to the Fifth Amendment of the U.S. Constitution. This constitutional check acts as an absolute floor, below which the Commission may not set the level of rates. The regulated carrier may raise the issue of its ability to raise equity capital, which is based on the Constitution, in any rate case regardless of the issues specified in the order of investigation or the methodology employed. The fact that G.O. 11 specifies the use of a comparable earnings test is of no consequence. If the comparable earning[s] test results in rate levels which are confiscatory in a given case, then the test must be put aside.
 
 
 51
 Id. at 55-56.
 
 
 52
 The Commission, after reviewing evidence relating to Matson's ability to attract capital, ultimately concluded that a 10.18 percent rate of return on rate base was not confiscatory. Id. at 59-60.
 
 
 53
 Matson does not challenge that determination. Matson does not raise a constitutional claim of confiscatory ratemaking. Pet. Br. at 17-18. Rather, Matson argues that the Commission erred in limiting its capital attraction test to the question of whether the rate determined under G.O. 11 was unconstitutional. Relying on a statement in Banton v. Belt Line Railway Corp., 268 U.S. 413, 423, 45 S.Ct. 534, 537-36, 69 L.Ed. 1020 (1925), that "[t]he mere fact that a rate is non-confiscatory does not indicate that it must be deemed to be just and reasonable," Matson argues that a rate of return can be constitutional, i.e., non-confiscatory, but still "unreasonable" or "unjust" because it inhibits the carrier's ability to attract capital and service its debt. Matson seems to be arguing that the Commission should have employed a capital attraction test not as a check on the constitutionality of the rate of return derived pursuant to G.O. 11, but as a purportedly broader check on the reasonableness of that rate. Reply Br. at 17.
 
 
 54
 Assuming, without deciding, that there is a distinction between a capital attraction test conducted pursuant to the statutory mandate of rate reasonableness and one conducted pursuant to the Fifth Amendment of the Constitution,[25] we decline to [295 U.S.App.D.C. 48] impose upon the Commission the obligation to conduct a capital attraction test as a check on the reasonableness of the result derived pursuant to the G.O. 11 comparable earnings test. While the law is clear that Matson must be permitted to earn sufficient revenue so as to be able to attract capital and service its debt, see Bluefield Water Works & Improv. Co. v. Public Serv. Comm'n, 262 U.S. 679, 692-93, 43 S.Ct. 675, 678-79, 67 L.Ed. 1176 (1923); Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944), the Commission has determined, in our view not unreasonably so far as this record is concerned, that
 
 
 55
 [the comparable earnings methodology] fulfills the basic requirements of Bluefield and Hope in that Matson will be allowed to earn a return on rate base equal to that generally being made on investments in other enterprises having corresponding risks and which also generates enough revenue to allow it to maintain its credit and attract capital.
 
 
 56
 Matson Navigation Co., Inc.--Proposed Rate Increase, 21 F.M.C. 532, 534 n. 9 (1978) (citations omitted). See also Harold Leventhal, The Vitality of the Comparable Earnings Standard for Regulation of Utilities in a Growth Economy, 74 YALE L.J. 989, 998, 1017 (1965) (Bluefield and Hope encourage comparable earnings standard; capital attraction test useful primarily for rare situations such as unusually large expansions or large capital commitments).
 
 
 57
 Matson argues that in this case, however, the comparable earnings test has produced an unreasonable result because the Commission's allowed total return on rate base is only very slightly above Matson's embedded and marginal cost of debt capital (about 10 percent). The result, according to Matson, is that its equity cannot yield the approximately five extra percentage points (over debt) that equity normally earns.
 
 
 58
 Matson's argument is not, however, strong enough to justify our overturning the methodology of G.O. 11. Matson offers no theoretical analysis suggesting any systemic defect in the comparable earnings test. It has shown only that another methodology would produce a different result, not that its alternative is systematically superior to the Commission's. The anomaly may be due to (1) to the existence of greater systemic defects in either the Commission's test or Matson's alternative, or (2) misapplications of either test. Only one of those four possible explanations (greater systemic defects in the Commission's test) would come close to justifying our forcing an alternative test on the Commission. Further, as Matson failed to explain the way in which it calculated the five-point spread between debt and equity returns, see Pet.Br. at 22-24 (and compare Rebuttal Testimony of Robert Rosenberg (Apr. 25, 1990) at 5 (Matson expert's numbers) with Surrebuttal Testimony of Robert A. Ellsworth (May 8, 1990) at 8-10 (Commission expert's response)), it can hardly be said even to have offered a genuine alternative methodology.
 
 
 59
 Moreover, there are strong policy reasons why we are reluctant to foist upon the Commission the obligation to conduct a separate capital attraction test as a check on the reasonableness of G.O. 11 rate of return. As noted above, in 1978 Congress amended the 1933 Act to impose strict time limits on the Commission's decisionmaking process in cases involving general rate increases. See Pub.L. No. 95-475, 92 Stat. 1494 (1978). Recognizing that disputes over the proper methodology for determining "just and reasonable" rates were a major cause of delay in Commission ratemaking proceedings, see H.R. REP. NO. 474, 95th Cong., 1st Sess. 10-11 (1977), Congress directed the Commission to prescribe by regulation "guidelines for the determination of what constitutes a just and reasonable rate of return." 46 U.S.C.App. § 845(a) (1988). In so doing, the Commission considered, and expressly rejected, the capital attraction test as the appropriate [295 U.S.App.D.C. 49] primary methodology for evaluating a carrier's rates.
 
 
 60
 The Commission ... has ... reappraised its prior decision to use rate of return on equity as the primary measure to test the reasonableness of rates. The Commission finds merit in the basic proposition ... that rate of return on rate base will provide a straightforward measure by which a carrier's revenue needs can be asserted and will avoid the problems in determining the debt/equity ratio for many of the carriers in the domestic offshore trades. In particular, the issue as to whether to use the capital structure of the carrier or its parent corporation has been a major obstacle. In past cases which have relied upon rate of return on equity as the standard to determine the reasonableness of rates, the Commission has encountered problems in determining the capital structure of those carriers which are subsidiary corporations....
 
 
 61
 Financial Reports of Common Carriers By Water in the Domestic Offshore Trades, 19 SRR 1283, 1308-09 (1980). It would be counterproductive at best to impose a capital attraction check on the Commission after it had already repudiated that methodology as too cumbersome and inconclusive in the first place.
 
 III. CONCLUSION
 
 62
 Congress has entrusted the Federal Maritime Commission with the difficult task of determining whether a carrier's rates are "just and reasonable." Having reviewed the Commission's order and the record upon which it is based, we conclude that the Commission has satisfactorily met its statutory obligation in this case.[26] The petition for review is
 
 
 63
 Denied.
 
 
 
 [1]
 The State of Hawaii and Tobias E. Seaman, for himself (doing business as Tobias Christmas Trees) and the National Association of Shippers, Consignees and Consumers for Maritime Affairs, filed protests to the rate increase and are intervenors in this proceeding
 
 
 [2]
 The Commission resolved the other five issues in Matson's favor and no party has sought judicial review of them
 
 
 [3]
 FMC regulations refer only to "comparable U.S. corporations." 46 C.F.R. § 552.6(d)(2)(ii) (1991). The Commission has held in previous proceedings, however, that manufacturing firms are the most comparable to firms in the shipping industry. Sea-Land Service, Inc., et. al., Proposed General Rate Increase in the Puerto Rico and Virgin Islands Trades, 20 Shipping Reg. (P & F) ("SRR") 1627, 1631 (1981), aff'd sub nom. Puerto Rico Maritime Shipping Auth. v. Federal Maritime Comm'n, 678 F.2d 327 (D.C.Cir.), cert. denied, 459 U.S. 906, 103 S.Ct. 210, 74 L.Ed.2d 167 (1982); Matson Navigation Co., Inc., Proposed Overall Rate Increase of 2.5 Percent Between United States Pacific Coast Ports and Hawaii Ports, 23 SRR 1216, 1220-21 & n. 5 (1986)
 The rate of return on total capital is calculated pursuant to the following formula:
 Return on total capital = (Net income after + Interest on long-term debt) divided by (Stockholders' equity + long-term debt).
 Matson Proceedings (Order Partially Adopting Initial Decision) ("Order") at 24.
 
 
 [4]
 To support its request for a rate increase a carrier is required to file with the Commission its projected rate of return on rate base (under its proposed rate increase) for the 12-month period commencing on the first day of the month following the date on which the rate changes are proposed to become effective (the "Test Year"). See 46 C.F.R. § 552.2(f)(1) (1991). As Matson's rate increase went into effect on March 10, 1990, the Test Year in this case is April 1, 1990 through March 31, 1991. Order at 4. Return on rate base is defined as Trade net income plus interest expense divided by Trade rate base. Id. § 552.6(d)(2)(ii). G.O. 11 contains elaborate rules for calculating Trade rate base, which is, generally speaking, the carrier's investment and working capital allocated to the particular trade. See generally id. § 552.6(b)
 
 
 [5]
 (11.93 percent) - (0.5 percent) - (1.25 percent) = 10.18 percent
 
 
 [6]
 See 46 U.S.C.App. § 845a (1988) ("[w]henever the ... Commission finds that any rate ... observed ... by [a] carrier ... is unjust or unreasonable, it may ... order enforced a just and reasonable ... maximum or minimum rate")
 
 
 [7]
 Matson actually makes these arguments in the reverse order. We address the Commission's risk adjustment first, however, because the issue of whether a rate of return on rate base below 10.58 percent is "unreasonable" arises only if we conclude that the Commission's reduction on account of relative risk was proper
 
 
 [8]
 The Commission, in its discretion and for good cause, can extend these time limits by 60 days. 46 U.S.C.App. § 845(b) (1988). The Commission exercised its discretionary authority in this proceeding by extending for 60 days the deadlines for issuance of both the initial and final decisions. Order at 4-5
 
 
 [9]
 Matson points out that the bulk of the cargo it carries moves in the westbound direction from the U.S. Pacific Coast to Hawaii, making that route Matson's headhaul leg. Sea-Land's shipping pattern, Matson notes, is just the opposite; its headhaul leg is from the Far East to the West Coast. Matson argues that the difference is significant because each carrier must cover the full costs of the round trip voyage on its headhaul leg. Thus, while Matson must earn enough to cover its full costs in its rates on cargo moving from the West Coast to Hawaii, Sea-Land, being a backhaul competitor in Matson's headhaul leg, need only cover its incremental costs on cargo moving from the West Coast to Hawaii. In other words, Sea-Land has a potential advantage in pricing cargo from the West Coast to Hawaii because it need only cover the marginal cost of stopping in Hawaii on its way to the Far East. Pet.Br. at 37
 Matson also argues that Sea-Land has a pricing advantage on account of Sea-Land's use of ships built with construction-differential subsidies ("CDS"). Such subsidies are provided by the federal government to encourage the construction in U.S. shipyards of vessels to be used in the U.S. foreign commerce. See 46 U.S.C.App. § 1151 (1988). Sea-Land's pricing advantage is limited to some extent, however, by the fact that Sea-Land must repay a portion of the CDS if it employs a CDS-vessel in the domestic trades. See id. § 1156.
 
 
 [10]
 We note that even Matson does not contend these FAK rates are indicative of a general Sea-Land pricing policy. At oral argument, counsel for Matson clarified that Matson is "not arguing that, across the board, Sea-Land is going to engage in rate competition." Transcript of Oral Argument at 16 (D.C.Cir. Feb. 14, 1992) ("Transcript")
 
 
 [11]
 Matson also argues that whether Sea-Land intends to compete based on service or price is irrelevant. Regardless of the nature of the competition, in Matson's eyes "Sea-Land has made a decision to enlarge its position in the Hawaii trade and it will actively seek cargo from Matson in order to achieve that goal." Reply Br. at 6. We find Matson's contention somewhat overdone. While the Commission could have articulated the point better, we read the Commission's distinction between price and service competition as predicated not on an assumption that service competition poses less of a threat than does price competition, but rather that Sea-Land, having opted to compete on service, will not in addition compete aggressively on price. The Commission's failure to make this point explicit, however, is not fatal. See PRMSA, 678 F.2d at 344 ("where the [Commission] has made reasonable use of its discretion based on a severely truncated proceeding as required by Congress, there is little to be gained by remanding for reconsideration of insubstantial, subsidiary errors")
 
 
 [12]
 APL applied to the Maritime Administration to enter the trade in February, 1987. The ALJ's initial decision was rendered in October, 1989. APL's application was denied in July, 1990. Resp.Br. at 25 n. 12. Review of that denial is currently pending before the district court of this Circuit. American President Lines, Ltd. v. Dr. Robert E. Martinez, Civ. No. 91-0101 (D.D.C. filed Jan. 17, 1991)
 
 
 [13]
 Operating-differential subsidies are payments from the federal government designed to subsidize the operation of vessels in the U.S. foreign commerce. See 46 U.S.C. App. § 1173 (1988)
 
 
 [14]
 See supra note 9
 
 
 [15]
 The Commission's order states that while there were eleven vessels of this type at the time Matson submitted its testimony, there are now only eight. Order at 47 n. 14. At oral argument before this court, however, counsel for the Commission stated that there were eleven such vessels available. Transcript at 28
 
 
 [16]
 Under the Jones Act, 46 U.S.C.App. § 883 (1988), domestic cargos are reserved exclusively to American vessels built in the United States and manned by United States crews. See generally THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW 283-84 (1987)
 
 
 [17]
 Matson argued that its capacity, and therefore much of its cost, is fixed in the short run. As traffic declines, costs directly related to container handling and claims are reduced, but costs relating to vessel operations, administration and debt service remain unchanged. As a result, Matson argued, for each 3 percent decline in traffic its rate of return on rate base declines by a full percentage point
 
 
 [18]
 This publication is a compilation of industry specific analyses produced by the International Trade Administration of the Department of Commerce
 
 
 [19]
 Matson also argues that the Commission erred in considering Matson's credit rating in evaluating its relative risk, confusing the type of risk that concerns a lender with that which concerns an equity investor. Reply Br. at 12. Whereas a lender is concerned with the debtor's risk of ruin, an equity investor analyzes risk in terms of the certainty and amount of future earnings. Id. "The fact that Matson will still be profitable after Sea-Land's expansion may protect its credit rating but will not prevent it from a substantial decrease in earnings." Id. at 12-13. Had the Commission determined that Matson was less risky than the average U.S. manufacturing firm solely on the basis of its credit rating, Matson would have a powerful argument. As one factor in the Commission's relative risk analysis, however, we find no error in the Commission's consideration of Matson's credit rating
 
 
 [20]
 The chart appeared as follows:
 Matson Navigation Co. Typical Manufacturer, Inc.
No Foreign Competition Faces Significant and
 (Jones Act) Growing Foreign Competition
Legal and Regulatory Barriers to No Significant L & R Barriers to Entry for
 Entry for Potential Domestic Potential Domestic Competition
 Competition
Dominant Firm/Price Leader in Minor Firm in Multi"Member Less
 Highly Concentrated Market Concentrated Market
Well"Defined, Relatively Broader, Less Well"Defined National and
 Predictable Market International Markets (Less Predictable)
"Lifeline" Service Non""Lifeline" Goods
Expanding Market (3.9% Growth Slower Growth (and Perhaps a Mild
 Expected in "Test" Year) Recession) in Domestic Market
 Surrebuttal Testimony of Robert M. Blair (May 8, 1990) at 7 (emphasis added).
 
 
 [21]
 See supra note 18 and accompanying text. Matson does not, however, challenge the reliability or accuracy of these sources. Indeed, while the ALJ shared Matson's concern about basing risk assessment on data other than that contained in the QFR, he nonetheless recognized that the sources relied upon by Blair were "undoubtedly fine sources." Initial Decision at 145 n. 36
 
 
 [22]
 The variation of earnings test is a statistical measurement of variability of past rates of return. As a Matson expert explained in his testimony before the Commission,
 [t]he underlying assumption of this approach is that investors prefer to commit capital to corporations with a stable rate of return so those corporations with a history of unstable rates of return will be considered relatively risky and thus required to pay a premium to attract capital.
 Direct Testimony of George M. Jones (Jan. 4, 1990) at 10 n. 1.
 Matson argues that the Commission's use of the lack of a variability of earnings analysis to justify its downward risk adjustment is disingenuous because, according to Matson, the Commission agreed with Matson and Hearing Counsel that such evidence would not be probative on the issue of Matson's relative risk. We disagree with Matson's grievance. The Commission did not use the absence of a variability of earnings test in this case to "justify" a downward adjustment for risk. It simply noted that in previous Matson rate investigations the risk picture looked different than it does now, due in large part to the differing evidence presented in those cases. Thus, even if the Commission may no longer view the variability of earnings test as an appropriate measure of Matson's risk, see Order at 37-38, 52, we do not see how this detracts in any way from the consistency of the Commission's approach to assessing relative risk.
 
 
 [23]
 "Business leverage" refers to the relative amount of cost that must be met prior to realizing net revenues. Order at 51 n. 16
 
 
 [24]
 The Commission noted that such a reduction was the mid-point range of adjustment advocated by the State of Hawaii--Hawaii had proposed a risk reduction of between 1.0 and 1.5 percentage points--and was smaller than the reduction of 1.75 percentage points proposed by Hearing Counsel. Order at 49-50
 
 
 [25]
 Unfortunately, the parties barely address this alleged distinction. Matson makes the bare-boned assertion that there is a difference, citing Banton, and the Commission, without citing any authority, rejects it. Resp.Br. at 37. If, indeed, there is a distinction between a statutory capital attraction test and a constitutional one, Matson does not begin to articulate precisely what that distinction is. Indeed, the Commission, purportedly conducting a constitutional capital attraction test, referenced the ALJ's discussion of Bluefield Water Works and Improvement Co. v. Public Service Commission, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923), and Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), Order at 53, the same cases that Matson cites in support of its statutory capital attraction test. Pet.Br. at 15-16. The Commission recognized that it could not set a rate "so low that the regulated carrier cannot attract capital," Order at 55; similarly, Matson argues that "a given rate of return ... may be legally defective because it is too low to enable the regulated company to attract capital." Pet.Br. at 17
 
 
 [26]
 As Judge Leventhal wrote:
 To conclude with a quip: Do not abandon Hope. As in so many matters assigned to regulatory commissions, the experts carry the discussion only to a point. The critical determinations are left for the commission within the perimeters set by constitutional requirements and fair treatment of investors and consumers. The dominant consideration is the furtherance of public service. The commission must apply, not formulae, but its practical judgment to the complex data before it.
 Leventhal, supra, at 1018.