**NATIONAL ASSOCIATION OF MIR-
ROR MANUFACTURERS, Plaintiff,**

v.

**UNITED STATES, Defendant.**

and

**Solaglass Coventry, Ltd., Sun Mirror, Hi
Mirror, Mie Glass, Mitsubishi Interna-
tional Corporation, Mitsui and Co.,
U.S.A., Inc., Orient Glass Co., Sentinel
Enterprises, Inc., and Glaverbel S.A.,
Defendants–Intervenors.**

Court No. 87–04–00592.

United States Court of
International Trade.

Aug. 25, 1988.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., and Geert De Prest, Washington, D.C., for plaintiff.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Jeanne E. Davidson, U.S. Intern. Trade Com'n, Paul R. Bardos, Washington, D.C., for defendant.

Brownstein, Zeidman and Schomer, Irwin P. Altschuler, Steven P. Kersner, David R. Amerine, and Donald S. Stein, Washington, D.C., for defendant-intervenors Solaglass Coventry, Ltd., Sun Mirror, Hi Mirror, Mie Glass, Mitsubishi Intern. Corp., Mitsui and Co., U.S.A., Inc., Orient Glass Co., and Sentinel Enterprises, Inc.

Ulmer, Berne, Laronge, Glickman and Curtis, Morton L. Stone, Ronald H. Isroff, and Peter A. Rome, Cleveland, Ohio, for defendant-intervenor Glaverbel S.A.

DiCARLO, Judge:

The National Association of Mirror Manufacturers (NAMM) moves under Rule 56.1 of the Rules of this Court for judgment on the agency record to contest the final determinations of the United States International Trade Commission (Commission) that an industry in the United States is not materially injured or threatened with material injury by reason of less than fair value imports in *Certain Unfinished Mirrors from the Federal Republic of Germany, Italy, Japan, Portugal, and the United Kingdom,* Inv. Nos. 731–TA–321 through 325 (Final), USITC Pub. 1938 (Jan. 1987), and *Certain Unfinished Mirrors from Belgium,* Inv. No. 731–TA–320 (Final), USITC Pub.1957 (Mar. 1987). This Court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(A)(i) and (B)(ii) (Supp. IV 1986) and 28 U.S.C. § 1581(c) (1982). The Court finds the Commission's determinations to be based on substantial evidence in the administrative record as a whole and according to law. The Court also finds that the Commission's determinations did not rely upon the additional views of two Commissioners on the issue of causation which the Commission did not reach after finding no material injury or threat of material injury to the domestic industry.

## BACKGROUND

NAMM filed petitions with Commerce and the Commission alleging that a United States industry was materially injured or threatened with material injury by reason of less than fair value imports of unfinished mirrors in stock sheet and lehr end sizes from Belgium, the Federal Republic of Germany, Italy, Japan, Portugal, and the United Kingdom. The Commission defined the product as unfinished mirrors, 15 square feet or more in reflecting area, provided for in item 544.54 of the Tariff Schedules of the United States, which have not been subjected to any finishing operations such as beveling, etching, edging, or framing. Mirrors subject to investigation are produced in a limited number of standard sizes and are frequently used in large projects such as hotel lobbies. USITC Pub. 1938 at 5.

Commerce found that unfinished mirrors imported from the Federal Republic of Germany, Italy, Japan, Portugal, and the Unit-

ed Kingdom were being sold at less than fair value. 51 Fed.Reg. 43,403–11 (Dec. 2, 1986). The Commission determined by a 4–1 vote that a United States industry was not materially injured or threatened with material injury, and that the establishment of a domestic industry was not materially retarded, by reason of unfinished glass mirrors imported from these countries. *Certain Unfinished Mirrors From the Federal Republic of Germany, Italy, Japan, Portugal, and the United Kingdom,* 52 Fed.Reg. 2459 (Jan. 22, 1987); USITC Pub. 1938 at 1.

Commerce later found that unfinished mirrors imported from Belgium were being sold in the United States at less than fair value. 52 Fed.Reg. 3156 (Feb. 2, 1987). The Commission determined by a 5–0 vote that a domestic industry was not materially injured or threatened with material injury, and that the establishment of a domestic industry was not materially retarded, by reason of the Belgian dumping. *Certain Unfinished Mirrors From Belgium,* 52 Fed.Reg. 8656 (Mar. 19, 1987); USITC Pub. 1957 at 1.

The Commission based its 4–1 and 5–0 determinations on a preponderance of positive indicators of the domestic industry's performance. The Commission's findings on the domestic industry's condition is virtually identical in both determinations because they are based on an identical record. The Commission's analysis on the threat of material injury is, however, different in each determination.

## DISCUSSION

In reviewing final negative determinations in antidumping duty investigations, the Court will hold unlawful those determinations of the Commission found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1982). Judicial review of a Commission determination for substantial evidence is a limited standard of review. *American Permac, Inc. v. United States,* 831 F.2d 269, 273 (Fed.Cir.1987), *cert. dismissed,* —— U.S.

——, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988); *Matsushita Elec. Indus. Co. v. United States,* 3 Fed.Cir. (T) 44, 45, 750 F.2d 927, 936 (1984). Under the substantial evidence standard for review, the Court will affirm the Commission's findings if they are supported in the record by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Federal Trade Comm'n v. Indiana Fed'n of Dentists,* 476 U.S. 447, 454, 106 S.Ct. 2009, 2015–16, 90 L.Ed.2d 445 (1986); *Surface Technology, Inc. v. United States Int'l Trade Comm'n,* 801 F.2d 1336, 1340 (F.E. Cir.1986); *Atlantic Sugar, Ltd. v. United States,* 2 Fed.Cir. (T) 130, 136, 744 F.2d 1556, 1562 (1984). Substantial evidence is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent the Commission's findings from being supported by substantial evidence. *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026–27, 16 L.Ed.2d 131 (1966); *Corning Glass Works v. United States Int'l Trade Comm'n,* 4 Fed.Cir. (T) 118, 123, 799 F.2d 1559, 1566 (1986); *Atlantic Sugar,* 2 Fed. Cir. (T) at 136, 744 F.2d at 1562.

To prevail under the substantial evidence standard, a plaintiff must show either that the Commission has made errors of law or that the Commission's factual findings are not supported by substantial evidence. It is within the Commission's discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence. *Maine Potato Council v. United States,* 9 CIT 460, 463, 617 F.Supp. 1088, 1091 (1985); S.Rep. 249, 96th Cong., 1st Sess. 74–75, *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 460. It is not this Court's function to decide that, were it the Commission, it would have made another decision on the basis of the evidence. *Matsushita Elec. Indus. Co.,* 3 Fed.Cir. (T) at 54, 750 F.2d at 936. However, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight. *Universal Camera Corp. v. National Labor Relations Bd.,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *Alberta Pork Producers' Marketing*

*Bd. v. United States,* 11 CIT ——, 669 F.Supp. 445, 463 (1987).

#### A. *The Material Injury Determinations*

NAMM contends both determinations that a domestic industry was not materially injured are invalid because they are not supported by substantial evidence on the record as a whole.

The Commission is directed to make final determinations of whether an industry in the United States is materially injured or threatened with material injury. 19 U.S.C. § 1673d(b)(1)(A) (1982). Congress defined "material injury" as "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A) (1982). *See also* S.Rep. No. 1298, 93d Cong., 2d Sess. 180 (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News 7186, 7317 ("Injury must be a harm which is more than frivolous, inconsequential, insignificant, or immaterial").

▮▮▮ The antidumping law is not punitive in nature, but is remedial and designed to protect industries in the United States from sales of imported merchandise at less than fair value which either caused or threatened to cause material injury. *Badger–Powhatan v. United States,* 9 CIT 213, 216–17, 608 F.Supp. 653, 656 (1985). As part of its injury determination the Commission considers the impact of imports on domestic producers of like products. 19 U.S.C. § 1677(7)(B)(iii) (1982); 19 C.F.R. § 207.26(a)(3) (1988). In examining the impact of less than fair value imports on a domestic industry, the Commission

shall evaluate all relevant economic factors which have a bearing on the state of the industry, including, but not limited to—

(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

(II) factors affecting domestic prices, and

(III) actual and potential negative effects on cash flow, inventories, employ-

ment, wages, growth, ability to raise capital, and investment.

19 U.S.C. § 1677(7)(C)(iii) (1982); 19 C.F.R. § 207.26(b)(3) (1988). The Commission's determinations must be based upon an independent evaluation of the factors with respect to the unique economic situation of each product and industry under investigation. *Alberta Pork Producers' Marketing Bd.,* 11 CIT at ——, 669 F.Supp. at 461. Neither the presence nor the absence of any factor listed in the statute is decisive with respect to whether an industry is materially injured, and the significance to be assigned to a particular factor is for the Commission to decide. S.Rep. No. 249, 96th Cong., 1st Sess. 88, *reprinted in* 1979 U.S.Code Cong. & Admin.News 474; *see also* H.R.Rep. No. 317, 96th Cong., 1st Sess. 46 (1979); 19 C.F.R. § 207.27 (1988).

▮▮▮ In considering whether the domestic unfinished mirror industry was suffering material injury, the Commission found growth in many indicators of the domestic industry's performance. As consumption rose during the period of investigation, two new firms entered the market, one existing firm installed a more efficient silvering line, and other existing firms expanded. USITC Pub. 1938 at 6, A–8–10; USITC Pub. 1957 at 6. Employment increased and wages rose. USITC Pub. 1938 at 7; USITC Pub. 1957 at 6. Costs increased and profits decreased as the industry expanded, but the industry as a whole remained profitable. USITC Pub. 1938 at 7; USITC Pub. 1957 at 6.

The Commission found that domestic consumption, capacity, and production all rose during the period of investigation. USITC Pub. 1938 at 7; USITC Pub. 1957 at 6–7. The Commission also found that the entrance of two new producers and improvements by existing firms increased the industry's capacity and upgraded production facilities. USITC Pub. 1938 at 6, 9; USITC Pub. 1957 at 6, 8. These findings are supported by evidence that domestic production increased 13.4 percent between 1983 and 1985 and increased again between January–June 1985 and January–June 1986. USITC Pub. 1938 at A–10 (Table 4).

There is also evidence that domestic production capacity increased by 27.0 percent between 1983 and 1985 and by 3.0 percent during the interim period. USITC Pub. 1938 at 7, A–10. Productivity of domestic manufacturers, measured by output per hour, increased by over 10.0 percent between 1983 and 1985 and again increased by over 2.0 percent during the interim period. USITC Pub. 1938 at A–14–15.

Domestic capacity utilization rates declined from 52.5 percent to 47.0 percent between 1983 and 1985, and declined from 48.5 to 47.3 percent during the interim period. The Commission found that capacity utilization fell only because the increase in capacity exceeded the overall increases in production. USITC Pub. 1938 at 7; USITC Pub. 1957 at 7. There is evidence that but for the 27.0 percent increase in capacity between 1983 and 1985, capacity utilization would have increased from 52.5 percent in 1983 to 59.6 percent in 1985. USITC Pub. 1938 at A–10.

The Commission found that the volume and total value of domestic shipments to the domestic market rose from 1983 to 1985 and declined only slightly in the interim period of January to June, 1986. USITC Pub. 1938 at 7; USITC Pub. 1957 at 7. This finding is supported by evidence that the quantity of total domestic shipments increased by 11.5 percent between 1983 and 1985, and that open market shipments (i.e. total shipments less intra-company shipments) increased by 15.9 percent between 1983 and 1985. USITC Pub. 1938 at A–12 (Table 6). Total shipments also increased during the interim period. Id. The Commission explained that total shipments declined in volume from 1984 to 1985 despite increases in open market shipments because intracompany shipments fell off during this period. USITC Pub. 1938 at 7, A–11–12; USITC Pub. 1957 at 7.

The Commission found that domestic inventory levels declined from 1983 to 1985 and remained stable during the interim period. USITC Pub. 1938 at 7; USITC Pub. 1957 at 7. This is supported by evidence that domestic inventories decreased by 9.0 percent between 1983 and 1985, and that

the ratio of inventories to total shipments declined by 20.0 percent from 6.0 percent in 1983 to 4.8 percent in 1985. USITC Pub. 1938 at 7, A–13 (Table 8); USITC Pub. 1957 at 7.

For employment the Commission found increases in the average number of workers, the number of hours worked, hourly wages paid, total hourly compensation and output per hour. USITC Pub. 1938 at 8; USITC Pub. 1957 at 7. Specifically, the number of production and related workers of unfinished mirrors increased by 6.0 percent between 1983 and 1985 and increased by over 7.0 percent during the interim 1986 period. USITC Pub. 1938 at A–14–15. The number of hours worked increased by 9.0 percent · between 1983 and 1985 and increased again during the interim period. Id. Hourly wages paid to production workers increased by 16.0 percent between 1985, and increased an additional 12.0 percent during the interim period. Id. Total hourly compensation increased by 19.0 percent between 1983 and 1985, and increased an additional 9.0 percent during the interim period. Id.

The Commission found domestic producer sales of unfinished mirrors to have increased in 1984 and continued to increase gradually for the balance of the period of the investigation. USITC Pub. 1938 at 8, A–19 (Table 13); USITC Pub. 1957 at 7–8. The Commission also found that operating income apparently rose in 1984 but dropped in 1985, the year in which the industry's general, selling, and administrative (GS & A), labor, and interest costs rose substantially to reflect industry expansion. USITC Pub. 1938 at 8; USITC Pub. 1957 at 8. As a share of net sales, both the cost of goods sold and GS & A increased in 1984–85. USITC Pub. 1938 at 8; USITC Pub. 1957 at 8. While the GS & A/net sales ratio declined slightly in the interim period, the cost of goods sold/net sales ratio continued to rise. USITC Pub. 1938 at 8, A–19; USITC Pub. 1957 at 8. Capital expenditures and investment both rose during the period of investigation, with capital expenditures posting a particularly sharp rise in 1985. USITC Pub. 1938 at 9; USITC Pub. 1957 at 8.

Based on the above factors, the Commission determined that the domestic industry was not experiencing material injury. USITC Pub. 1938 at 9; USITC Pub. 1957 at 8–9. NAMM asserts the determinations are unlawful because the Commission failed to reach affirmative injury determinations after a number of domestic producers testified that a major proportion of the domestic industry suffered material injury.

The Court finds the Commission did not err in choosing to rely on financial data rather than the domestic industry's testimony. The Court also finds the Commission's determinations that a domestic industry was not materially injured are according to law and supported by substantial evidence, including evidence of increased capacity, increased production, increased shipments, increased market demand, increased net sales, increased employment, and the entrance of new producers into the United States industry, as well as further evidence that imports were either decreasing or rising only slowly, foreign producers were generally operating at high levels of capacity and therefore had little unused capacity to increase exports to the United States, importers did not hold inventory, and domestic prices were rising or steady.

■ NAMM concedes the domestic mirror market was in a period of economic recovery when it petitioned for relief under the trade laws. Plaintiff's Brief at 9. NAMM contends, however, that the Commission's determinations are contrary to law because they create an "absurd result" that denies relief to an industry when it is in a period of recovery.

Contrary to NAMM's broad implication that the result in this case creates a general rule that a domestic industry cannot obtain relief when it is in a period of recovery, the fact that an industry has been lifted out of a recession does not automatically trigger a conclusion that foreign imports are not adversely affecting the domestic market because an industry's economic recovery can also be stymied by low-priced imports which expand their share of the recovering market and create artificially low prices. *USX Corp. v. United*

*States*, 11 CIT ——, 655 F.Supp. 487, 490 (1987). Nonetheless, when the statutory factors which the Commission considers indicate that the domestic industry is healthy, the Commission may indeed determine that the domestic industry is not experiencing or facing material injury. *See Badger–Powhatan v. United States*, 9 CIT 213, 217, 608 F.Supp. 653, 657 (1985); *American Spring Wire Corp. v. United States*, 8 CIT 20, 21–22, 590 F.Supp. 1273, 1276 (1984), *aff'd sub nom. Armco, Inc. v. United States*, 3 Fed.Cir. (T) 123, 760 F.2d 249 (1985). The Commission has discretion to make a reasonable interpretation of the facts. *Copperweld Corp. v. United States*, 12 CIT ——, 682 F.Supp. 552, 577 (1988).

■ NAMM also claims the Commission acted contrary to law because it accepted aggregated data when NAMM had offered testimony indicating that a major portion of a United States industry was injured.

A substantially similar issue was recently addressed in *Copperweld*, 12 CIT at ——, 682 F.Supp. at 569, which noted that 19 U.S.C. § 1673d(b)(1) requires the Commission to make a final determination of whether a "domestic industry" is materially injured, and that 19 U.S.C. § 1677(4)(A) defined the domestic industry as "the domestic producers *as a whole* of the like product." *Copperweld* found that this language manifests that Congress intended the Commission to determine whether

the domestic industry (as a whole) has experienced material injury due to the imports. This language defies the suggestion that the [Commission] must make a disaggregated analysis of material injury. Furthermore, it appears that if Congress had intended that the [Commission] analyze injury on a disaggregated basis, Congress would have made this intention explicit, as it did for example in regard to regional industries.

*Copperweld*, 12 CIT at ——, 682 F.Supp. at 569.

Following *Copperweld*, the Court holds that the Commission acted according to law in considering the domestic unfinished mirror industry as a whole where no allegation

of regional industries was made under 19 U.S.C. § 1677(4)(C) (1982).

The Court finds that the Commission's determinations that a domestic industry in the United States was not experiencing material injury is according to law and supported by substantial evidence on the record.

### B. *Threat of Material Injury*

█] On the question of threat of material injury by reason of imports from the Federal Republic of Germany, Japan, and the United Kingdom, the Commission majority found that producers of unfinished mirrors from those countries were operating at high rates of capacity utilization and therefore had little unused capacity available for increasing exports to the United States, and there was no information before the Commission that any of the respondents planned to increase capacity significantly. USITC Pub. 1938 at 10. The market share of imports from the five countries in the first set of investigations were either declining or not rising rapidly. *Id.* at A–31. Many imports sold for higher prices than domestic mirrors. *Id.* at 10. The Commission found that because nearly all imports are pre-ordered and shipped directly to the buyer, importers did not hold inventories. *Id.* at A–22. The Commission concluded that the domestic industry faced no threat of material injury by reason of imports from the Federal Republic of Germany, Italy, Japan, Portugal, and the United Kingdom. *Id.* at 10.

In its negative determination on threat of material injury due to imports from Belgium, the Commission found that the Belgian producer of unfinished mirrors was operating at a high rate of capacity utilization and there was no evidence that it planned to increase production capacity significantly. USITC Pub. 1957 at 9–10, A–4; R.Doc. 124 at 130–31. (Transcript of hearing). The market share of the Belgian imports declined from 1984 to 1985. USITC Pub. 1957 at 10. Although the market share rose in the interim period, the Commission found that the increase was not rapid. *Id.* Moreover, the Belgian market share was minuscule compared with the growing market share of other imports. *Id.* at A–26. Because all imports are produced to order, the importer does not hold inventories. *Id.* at 10. Although Belgian imports undersold domestic unfinished mirrors, the Commission noted that domestic producers' prices had risen or remained stable during the period of investigation. *Id.*

Considering the small market penetration of Belgian imports, the Commission determined there was little probability that future imports would depress prices or have a suppressing effect in the domestic market. *Id.* at 10–11. The Commission thus determined that the Belgian imports did not threaten the domestic industry with material injury. *Id.* at 11.

NAMM argues the Commission's determinations that the domestic industry was not threatened with material injury are unlawful because the Commission's focus on capacity utilization ignores other evidence as to present and potential effects of less than fair value imports.

As with the injury determination, neither the presence nor the absence of any factor listed in the statute is decisive with respect to whether an industry is threatened with material injury, and the significance to be assigned to a particular factor is for the Commission to decide. *See Maine Potato Council v. United States*, 9 CIT 460, 463, 617 F.Supp. 1088, 1091 (1985).

Furthermore, absent some showing to the contrary, the Commission is presumed to have considered all of the evidence in the record. *British Steel Corp. v. United States*, 8 CIT 86, 98, 593 F.Supp. 405, 414 (1984); *Rhone Poulenc, S.A. v. United States*, 8 CIT 47, 55, 592 F.Supp. 1318, 1326 (1984); *Sprague Elec. Co. v. United States*, 2 CIT 302, 310, 529 F.Supp. 676, 682 (1981). This is especially true where the facts allegedly ignored were presented to the Commission at a open hearing. While it is an abuse of discretion for an agency to fail to consider an issue raised by the record evidence, *Timken Co. v. United States*, 10 CIT ——, 630 F.Supp. 1327, 1337–38 (1986), the fact that certain information is not discussed in a Commission

determination does not establish that the Commission failed to consider that information because the Commission is not obligated to address each and every argument advanced by a party to an investigation. *Empire Plow Co. v. United States*, 11 CIT ——, 675 F.Supp. 1348, 1354 (1987); *British Steel Corp.*, 8 CIT at 98, 593 F.Supp. at 414. Congress did not mandate the Commission to discuss every facet of its investigation, but only "material issues of law or fact." *Jeannette Sheet Glass Corp. v. United States*, 9 CIT 154, 161, 607 F.Supp. 123, 130 (1985), *appeal dismissed*, 803 F.2d 1576 (Fed.Cir.1986), *vacated in part*, 11 CIT ——, 654 F.Supp. 179 (1987). *See also* H.R.Rep. 153, 96th Cong., 1st Sess. 27 (1979), *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 665, 685. When a specific issue is material to the Commission's determination, "then of course the Commission must state its findings of fact and conclusions of law on that aspect of its investigations." *Jeannette Sheet*, 9 CIT at 162, 607 F.Supp. at 130.

The Court finds the Commission's determinations on the threat of material injury to be supported by substantial evidence on the record as a whole and according to law.

### C.  *Effect of Commissioners' Additional Views*

■ NAMM's remaining issues concern the legal effect of two Commissioner's additional views made for the sake of argument to state that even if the domestic industry was injured it was not "by reason of" the European and Japanese imports.

After reaching negative determinations under 19 U.S.C. § 1673(b)(1) (1982) that a United States industry was not materially injured or threatened with material injury, the Commission did not reach the issue of causation in either of the two determinations. *See Badger–Powhatan v. United States*, 9 CIT 213, 217, 608 F.Supp. 653, 657 (1985); *American Spring Wire Corp. v. United States*, 8 CIT 20, 21–22, 590 F.Supp. 1273, 1276 (1984), *aff'd sub nom. Armco, Inc. v. United States*, 3 Fed.Cir. (T) 123, 760 F.2d 249 (1985).

Having found the 4–1 and 5–0 determinations that no industry in the United States is materially injured or threatened with material injury to be supported by substantial evidence and according to law, the Court does not reach plaintiffs' arguments concerning the validity of these additional views on causation. A defect in a Commissioner's additional views generally does not affect the viability of the majority determination where the proper number of Commissioners have participated and the allegedly defective views form no part of the majority determination. *See Rhone Poulenc, S.A. v. United States*, 8 CIT 47, 48 n. 4, 592 F.Supp. 1318, 1320 n. 4 (1984).

### CONCLUSION

The Commission's determinations that a domestic industry was not materially injured or threatened with material injury by reason of dumped imports of unfinished mirrors from Belgium, the Federal Republic of Germany, Italy, Japan, Portugal, and the United Kingdom are according to law and supported by substantial evidence on the record as a whole, including evidence of increased capacity, increased production, increased shipments, increased market demand, increased net sales, increased employment, and the entrance of new producers into the United States industry, as well as further evidence that imports were either decreasing or rising only slowly, foreign producers were generally operating at high levels of capacity and therefore had little unused capacity to increase exports to the United States, importers did not hold inventory, and domestic prices were rising or steady. The individual additional views that even if the industry was injured, it was not by reason of the less than fair value imports, do not affect the validity of the majority's determinations that there is no material injury or threat of material injury to a domestic industry.

### JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now in conformity with that decision

IT IS HEREBY ORDERED that this action is dismissed.