**Slip Op. 99-11**

# United States Court of International Trade

<table>
<tr>
<td>

FUJITSU LIMITED AND FUJITSU
AMERICA, INC.,

         Plaintiffs,

    v.

UNITED STATES,

         Defendant,

   and

CRAY RESEARCH, INC.,

         Defendant-Intervenor.

</td>
<td>

Before: Pogue, Judge

Court No. 97-11-02021

</td>
</tr>
</table>

[Final determination on domestic like product and standing affirmed.]

Decided: January 27, 1999

Akin, Gump, Strauss, Hauer & Feld, L.L.P. (Warren E. Connelly and James E. Mendenhall) for Plaintiffs.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Department of Justice (Lucius B. Lau), Patrick V. Gallagher, Jr., Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Counsel, for Defendant.

Wilmer, Cutler & Pickering (John D. Greenwald, Ronald I. Meltzer, Amber Cottle, and Juan Millan for Defendant-Intervenor.

## OPINION

**POGUE, Judge:** Plaintiffs, Fujitsu Limited and Fujitsu America, Inc. ("Fujitsu") move for judgment on the agency record pursuant to U.S. CIT Rule 56.2 challenging the United States Department of Commerce's ("Commerce") "domestic like product" determination and Commerce's decision not to initiate a standing

inquiry in its investigation of vector supercomputers from Japan. See Initiation of Antidumping Duty Investigation: Vector Supercomputers from Japan, 61 Fed. Reg. 43,527 (Dep't. Commerce Aug. 23, 1996)("Initiation Notice"). Plaintiffs contend that Commerce's domestic like product determination was erroneous, and therefore, its finding of domestic industry support for an antidumping investigation was fatally flawed.

## Background

On July 29, 1996, domestic producer Cray Research, Inc. ("Cray") petitioned Commerce to investigate sales at less than fair value of vector supercomputers, defined as "any computer with a vector hardware unit as an integral part of any of its central processing unit boards" from Japan. Antidumping Petition from Cray Research, Inc., P.R. Doc. 1 at 8 (Jul. 29, 1996)("Petition") (emphasis provided). Alleging differences between vector and non-vector supercomputers in their performance, architecture, production, and application, Cray limited the scope of its petition to vector supercomputers. See id. at 8-15. Cray also defined the "domestic like product" as vector supercomputers. See id. at 15.

Fujitsu challenged the petition, arguing that the domestic like product of the investigation must include numerous other supercomputers that are "like, or in the absence of like, most similar in characteristics and uses" to vector supercomputers. See August 14, 1996 Letter from Fujitsu, P.R. Doc. No. 9 at 1 (citing

19 U.S.C. §1677(10)(1994)).  Fujitsu claimed that vector and non-vector supercomputers compete directly and share the same channels of distribution and end use.  See id. at 5-18.  In addition, Fujitsu maintained that customers perceive vector and non-vector supercomputers as interchangeable, and that both vector and non-vector supercomputers are similar in price and have common manufacturing facilities.  See id. at 18-23.  Accordingly, Fujitsu asked Commerce to poll the domestic producers of both vector and non-vector supercomputers in determining whether industry support exists for the investigation pursuant to 19 U.S.C. § 1673a(c)(1)(B) & (c)(4)(D).  See id. at 24-25.  Cray submitted rebuttal comments to Fujitsu's arguments on August 16, 1996, see August 16, 1996 Letter from Cray, P.R. Doc. No. 10, and Fujitsu responded with a second submission on August 19, 1996.  See August 19, 1996 Letter from Fujitsu, P.R. Doc. No. 12.

Commerce gave notice of the initiation of its investigation on August 23, 1996, defining the scope to include "all vector supercomputers[.] . . .  A vector supercomputer is any computer with a vector hardware unit as an integral part of its central processing unit ['CPU'] boards."  Initiation Notice at 43,528.  The scope definition in the Initiation Notice was based on the petition.  See id.  Commerce concluded that the vector unit in the CPU "identifies both the Japanese vector supercomputers that the petitioner would have subject to the antidumping investigation and the domestically-produced products that would define the domestic

industry."  Id. at 43,528-529.

Having decided to define the domestic like product as vector

supercomputers, Commerce addressed Fujitsu's argument, explaining:

> When properly analyzed, the evidence of record
> demonstrates that there are clear dividing lines between
> the characteristics and uses of the vector supercomputers
> subject to investigation and the various other types of
> supercomputers.  Significantly, the vector supercomputer
> has a different computer architecture than the non-vector
> computer technologies and, consequently, it processes
> information differently.  The close physical proximity of
> the vector hardware to the computer's central processing
> boards and high memory bandwidth (with limited
> parallelism) contribute to the high speeds with which
> vector supercomputers process information.  These
> differences give vector supercomputers different
> performance characteristics than non-vector
> supercomputers.  For example, vector supercomputers are
> more efficient dealing with linear and matrix algebra
> equations than are non-vector supercomputers.  Given the
> states of the different supercomputer technologies today,
> there are computer modeling applications where only the
> vector supercomputers are used.  For example, only vector
> supercomputer bids met the technical requirements (which
> involved weather forecasting and climate modeling
> applications) in the University Corporation for
> Atmospheric Research ("UCAR") procurement from which this
> petition derives the export price.

Id. at 43,529.

Defining the domestic like product as vector supercomputers,

Commerce determined that there was industry support for the

petition because the petitioner, the only domestic producer of

vector supercomputers, accounted for more than fifty percent of the

total domestic production of vector supercomputers.  See id.  Thus,

Commerce proceeded with its investigation, ultimately determining

that Japanese vector supercomputers were being sold in the United

States at less than fair value.  See Notice of Final Determination

of Sales at Less Than Fair Value: Vector Supercomputers From Japan,

62 Fed. Reg. 45,623-624 (Dep't Commerce Aug. 28, 1997).


**Standard of Review**

In reviewing a final determination, the Court must decide

whether Commerce's determination is in accordance with law and

whether Commerce's conclusions are supported by substantial

evidence on the record.  Section 516A(b)(1)(B)(i) of the Tariff Act

of 1930, as amended, 19 U.S.C. § 1516a(b)(1)(B)(i)(1994).


**Discussion**

**I.  Scope and Industry Support**

An antidumping investigation may be commenced in one of two

ways: 1) Commerce may self-initiate an investigation, see 19 U.S.C.

§ 1673a(a); 19 C.F.R. § 353.11 (1996); or 2) an interested party

may file a petition alleging the elements necessary for imposition

of an antidumping duty.  See 19 U.S.C. § 1673a(b); 19 C.F.R. §

353.12 (1996).  To initiate an investigation in response to a

petition, Commerce must "determine whether the petition alleges the

elements necessary for the imposition of a duty" and "determine if

the petition has been filed by or on behalf of the industry[,]"

i.e., whether the domestic industry supports the investigation.  19

U.S.C. § 1673a(c)(1)(A).

Before the Uruguay Round Agreements Act ("URAA") took effect,

Commerce could presume industry support unless a petition was actively opposed. See, e.g., NTN Bearing Corp. v. United States, 15 CIT 75, 79, 757 F. Supp. 1426, 1429 (1991), aff'd, 972 F.2d 1355 (Fed. Cir. 1992). Now, Commerce may not operate on the basis of the presumption, but rather must establish that:

> (i) the domestic producers or workers who support the petition account for at least 25 percent of the total production of the domestic like product, and

> (ii) the domestic producers or workers who support the petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition.

19 U.S.C. §1673a(c)(4)(A)(emphasis provided). This determination must be concluded within twenty days of the filing of the petition.[1] 19 U.S.C. § 1673a(c)(1)(A).

Nineteen U.S.C. § 1677(4)(A) defines "industry" as the "producers as a whole of a domestic like product[.]" Therefore, based on the language of 19 U.S.C. § 1673a(c)(4)(A), Commerce must define the domestic like product in order to determine whether the industry making the products included in the scope of the Petition support the initiation of an investigation.

---

[1]The URAA also provides that "[a]fter [Commerce] makes a determination with respect to initiating an investigation, the determination regarding industry support shall not be reconsidered." 19 U.S.C. § 1673a(c)(4)(E). Prior to the URAA, parties could challenge Commerce's industry support determination late in the investigation. See Tianjin Mach. Import & Export Corp. v. United States, 16 CIT 931, 944, 806 F. Supp. 1008, 1021 (1992).

**II.  Commerce's Domestic Like Product Determination**

Commerce based its initial definition of domestic like product on Cray's petition, according to its usual practice.  See Initiation Notice at 43,528.  Commerce explained,

> [Nineteen U.S.C. § 1677(10)] defines domestic like product as "a product that is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this title." Thus, the reference point from which the like product analysis begins is "the article subject to an investigation," *i.e.*, the class or kind of merchandise to be investigated, which normally will be the scope as defined in the petition.

Id.  See also Kern-Liebers USA, Inc. v. United States, 19 CIT 393, 396, 881 F. Supp. 618, 621 (1995)("[T]he agency generally exercises [its] 'broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition.'") (quoting Minebea Co., Ltd. v. United States, 16 CIT 20, 22, 782 F. Supp. 117, 120 (1992), aff'd on other grounds, 984 F.2d 1178 (Fed. Cir. 1993)).  Commerce determined that "there are clear dividing lines between the characteristics and uses of the vector supercomputers subject to investigation and the various other types of supercomputers."  Initiation Notice at 43,529 (emphasis added).  Therefore, Commerce concluded that the domestic like product is limited to vector supercomputers.[2]  See id.

---

[2]Having identified the domestic like product, Commerce did not have to extend its investigation to identify a product "most similar in characteristics and uses" to vector supercomputers. See 19 U.S.C. § 1677(10).

Commerce based its standing determination on this definition. See id.

     Plaintiffs argue that Commerce's determination is not supported by substantial evidence. See Pl.'s Mem. in Supp. of Mot. J. on the Agency R. at 22. Plaintiffs claim that "[t]he domestic like product . . . must be defined based on the entire range of characteristics and uses of the imported product, not just those which Cray identified in its petition." Id. at 24.

     Plaintiffs maintain that Commerce traditionally uses the International Trade Commission ("Commission") test to define the domestic like product. See id. at 23 (citing High Information Content Flat Panel Displays and Display Glass Therefor from Japan, 56 Fed. Reg. 32,376, 32,381 (Dep't Commerce July 16, 1991)(final determination); Certain Textile Mill Products and Apparel From Sri Lanka; Cotton Inspectors' Gloves, 50 Fed. Reg. 9,826, 9,827 (Dep't Commerce Mar. 12, 1985)(final countervailing duty determination).[3] Factors that the Commission typically considers in defining domestic like product include (1) physical characteristics and uses, (2) interchangeability of products, (3) channels of distribution, (4) customer and producer perceptions of the products, (5) the use of common manufacturing facilities and personnel, and (6) price. See id. at n.42. Plaintiffs ask this

---

     [3]Although these are pre-URAA determinations, the "domestic like product" definition has not been altered as a result of the URAA. Therefore, the URAA does not mandate a change in Commerce's defining of the domestic like product.

Court to utilize an adverse inference to establish that the Commission factors not discussed by Commerce would not support its like product determination. See id. at 23-24. Using the "entire range" of the Commission factors, Plaintiffs claim, the like product would include non-vector supercomputers. See id. at 24.

The Court finds that even if it accepts the Plaintiffs' argument, there is substantial evidence in the record to support Commerce's finding.[4] When examining Commerce's factual determinations, the Court must determine whether the record as a whole contains "such relevant evidence as a reasonable mind might accept as adequate to support [Commerce's] conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938); Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951)(quoted in Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933

---

[4]Moreover, the Court notes that in reviewing the Commission's like product findings for the purpose of investigating injury to the domestic industry, it is not the province of the courts to change the priority of the relevant like product factors or to reweigh or judge the credibility of conflicting evidence. See Iwatsu Elec. Co. v. United States, 15 CIT 44, 47, 758 F. Supp. 1506, 1509 (1991). "It is within the Commission's discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence." Maine Potato Council v. United States, 9 CIT 293, 300, 613 F. Supp. 1237, 1244 (1985). Therefore, by analogy, for the purpose of standing, it is within Commerce's discretion to weigh the priority of the relevant like product factors and determine each factor's significance. Cf. NTN Bearing Corp., 15 CIT at 80, 757 F. Supp. at 1430. Here, Commerce appropriately focused its inquiry on characteristics and uses because the statute defines domestic like product as a product that is like or "most similar in characteristics and uses with" the subject merchandise. See Def.'s Mem. in Opp'n to Pl.'s Mot. for J. on the Agency R. at 31 (citing 19 U.S.C. §1677(10)).

(Fed. Cir. 1984)).  For the purposes of Commerce's like product inquiry, the record consisted of Cray's petition, Fujitsu's two August submissions, which included over 450 pages of articles analyzing supercomputer systems, and Cray's rebuttal comments.[5]

## A.  Characteristics

### 1.  Physical Characteristics

With regard to physical characteristics, Commerce noted that vector supercomputers have a different computer architecture than non-vector supercomputers.  See Initiation Notice at 43,529. Substantial evidence supports this conclusion.

First, the Court notes that Fujitsu does not dispute that vector hardware being integral to any of the computer's CPU boards is a characteristic limited to vector supercomputers.  See Pl.'s Mem. in Supp. of Mot. J. on the Agency R. at 27.  In its Initiation Notice, Commerce indicated that this was the key characteristic identifying the domestic like product.  See Initiation Notice at 43,528-529.

---

[5]The Plaintiffs assert that Commerce failed to consider their arguments or adequately review the voluminous documentary evidence they submitted.  See Pl.'s Mem. in Supp. of Mot. J. on the Agency R. at 3, 21-22.  Plaintiffs' argument is unfounded, however, because Commerce summarized Plaintiffs' arguments in its Initiation Notice.  See Initiation Notice at 43,528.  Moreover, absent some showing to the contrary, Commerce is entitled to the presumption that it considered the record evidence as a whole.  Cf.  Nat'l Ass'n of Mirror Mfrs. v. United States, 12 CIT 771, 779, 696 F. Supp. 642, 648 (1988)(holding that "the Commission is presumed to have considered all of the evidence in the record.").

Second, numerous reports included in Plaintiffs' August 14, 1996 submission characterized vector supercomputer architecture as particular to vector supercomputers. The Smaby Group report, for example, not only characterized vector supercomputer architecture as distinct, but listed Cray as its only domestic producer: "The parallel/vector[6] architecture is the most popular for high-end scientific computing. . . . Machines in this class are today manufactured by Cray Research (the overwhelmingly dominant vendor), Fujitsu, NEC, Hitachi, and Cray Computer." August 14, 1996 Letter from Fujitsu, P.R. Doc. 9, Exhibit 7 (Smaby Group, GLOBAL COMPETITIVENESS OF JAPANESE SUPERCOMPUTERS at 8).

The International Data Corporation ("IDC") report stated, "We expect the classical vector market to remain the central computational platform throughout the rest of the decade, but with decreasing demand outside of the installed base." Id., Exhibit 10 (IDC, HIGH PERFORMANCE SYSTEMS: 1995-1999 FORECAST SUMMARY at 5). Finally, Larry Smarr, Director of the National Center for Supercomputing Applications ("NCSA") testified before the House Science Committee Basic Research Subcommittee that, "NCSA has

---

[6]Smaby Group defined "parallel/vector" architecture as a design combining several processors in a single system, but including vector processors as an integral component. See August 14, 1996 Letter from Fujitsu, P.R. Doc. no. 9, Exhibit 7 (Smaby Group, GLOBAL COMPETITIVENESS OF JAPANESE SUPERCOMPUTERS at 2). Therefore, parallel/vector architecture falls within Commerce's definition of vector supercomputers, i.e., a "computer with a vector hardware unit as an integral part of its central processing unit boards." Initiation Notice at 43,528.

worked with users to develop and migrate application codes through three distinct phases of supercomputer architectures: shared memory vector processors; massively parallel processors; and scalable memory RISC processors." Id., Exhibit 3 (*Hearings Regarding the National Science Foundation Before the Subcommittee on Basic Research of the House Committee on Science* (Mar. 19, 1996)(statement of Larry L. Smarr, Director of NCSA at 2).

### 2. Performance Characteristics

The record also contains substantial evidence supporting Commerce's finding that vector supercomputers possess different performance characteristics than non-vector supercomputers. See Initiation Notice at 43,529. Again, numerous articles attached to Plaintiff's August 14, 1996 submission characterized vector supercomputers as having different performance characteristics, including the following passage from the Smaby Group report:

> For the last twenty years, enterprise-level supercomputers from all manufacturers have employed vector processing to achieve very high calculation rates. A conventional, or "scalar," processor gains speed by reducing the time it takes to complete each instruction in series. The vector processor (or pipeline) benefits from the predictability of array operations. Memory accesses and individual calculation steps are overlapped for each element in the array, allowing each successive calculation to be initiated very rapidly. This results in much higher aggregate processing rates for applications which make effective use of vectors.

August 14, 1996 Letter from Fujitsu, P.R. Doc No. 9, Exhibit 7 (Smaby Group, GLOBAL COMPETITIVENESS OF JAPANESE SUPERCOMPUTERS at 2).

Bill Buzbee, the director of NCAR's Scientific Computing Division, compared the processing speeds of massively parallel processors ("MPPs") and vector supercomputers as follows: "To overcome the software disadvantage [of MPP systems], a 1,000-node MPP machine would have to work at 40 GFLOPS [(billion floating point operations per second)] four to eight times faster than currently to make it as attractive as a 20-GFLOPS shared-memory [vector] supercomputer of comparable price[.]" Id., Exhibit 12 (Gary H. Anthes, *Research Lab Sizes Up Slew of Supercomputers*, COMPUTERWORLD, Aug. 1, 1994).

Finally, a September 8, 1995 excerpt from Science distinguished vector processing from non-vector computer processing as follows: "the vector computer derives its power from expensive, custom-built processors that perform calculations simultaneously on long strings of numbers--vectors--instead of adding, subtracting, multiplying, and dividing numbers two at a time." Id., at Exhibit 12 (Robert Pool, *Off-the-Shelf Chips Conquer the Heights of Computing*, SCIENCE, Sept. 8, 1995).

**B. Uses**

Finally, the record contains substantial evidence supporting Commerce's conclusion that certain applications are chiefly performed by vector supercomputers. See Initiation Notice at 43,529. Numerous articles attached to Plaintiffs' submissions to Commerce corroborate Commerce's finding. Although many of Plaintiffs' articles do indicate that vector supercomputers face

increasing competition from non-vector supercomputers, they also demonstrate that certain applications still demand vector supercomputers alone.

For example, while noting the increasing competition vector supercomputers face from parallel processing computers, a January 1996 article from BYTE cautioned,

> But don't abandon vector processing just yet. <u>In certain situations</u>, a vector-processing system delivers better performance than a parallel-processing system, especially when dealing with complex simulations involving huge data arrays. That's because the average memory-access times can be shorter with vector processing, even with a large memory space. In contrast, a parallel-processing system with lots of memory might have to wait quite a while for data to move from one part of the system to another[.]

August 14, 1996 Letter from Fujitsu, P.R. Doc. 9, Exhibit 12 (Tom Thompson, *The World's Fastest Computers*, BYTE, January 1996).

Moreover, in Fujitsu's August 19, 1996 letter, the Plaintiffs note Cray's intention to create a hybrid computer (incorporating each of the three main architectures--MPP, symmetric multiprocessors ("SMP"), and vector) as indication that there were not clear dividing lines between the three. <u>See</u> August 19, 1996 Letter from Fujitsu, P.R. Doc. No. 12, at 4. To the contrary, Robert Ewald, president of Cray, explained that the company intended to create a hybrid supercomputer based on their recognition that each architecture performs certain applications better than the others. <u>See</u> August 14, Letter from Fujitsu, P.R. Doc. No. 9, Exhibit 12 (Richard McCormack, *Cray Research to Merge Vector, SMP and MPP into One Architecture*, HIGH PERFORMANCE COMPUTING

AND COMMUNICATIONS WEEK, Feb. 9, 1995).    In the article, Ewald explained,

> We have all three [architectures] because of our belief that different applications would run best on all three and we always believed it would be a transitory thing. . . . In concept, if you looked at the parallel world today as it exists, there are some large problems that really will parallelize well.  There are some that run best in the vector world and there are smaller applications that run best in the SMP world.

Id.

Finally, only bids that included vector supercomputers met the technical requirements for weather modeling in the UCAR procurement from which Commerce derived the export price.  See Initiation Notice at 43,529; see also Petition at Annex A (May 20, 1996 UCAR Press Release).[7]

## C.  Other Considerations

Naturally, the process of determining whether one product is

---

[7]Plaintiffs claim that "Cray purposefully failed to inform [Commerce] that [Cray's] initial and final bids to UCAR included both vector and non-vector machines[,]" and asked the Court to take judicial notice of this fact.  Pl.'s Mem. in Supp. of Mot. J. on the Agency R. at 19-20.  That Cray may have included both vector and non-vector supercomputers in its bid, however, is not material. First, vector supercomputers are typically designed to include scalar processors to enable them to handle computations with non-vectorized data.  See August 14, 1996 Letter from Fujitsu, P.R. Doc. No. 9, Exhibit 7 (Smaby Group, GLOBAL COMPETITIVENESS OF JAPANESE SUPERCOMPUTERS at 2).  Moreover, what is material is that, although UCAR considered both vector and non-vector supercomputers, the only three bids UCAR deemed competitive featured vector systems.  See Pl.'s Mem. in Supp. of Mot. J. on the Agency R., Exhibit A (In the Matter of Vector Supercomputers from Japan, hearing before the International Trade Commission, Inv. No. 731-TA-750(F), Aug. 27, 1997).

"like" another entails some line drawing. For purposes of standing, Congress afforded Commerce the discretion to draw the line. See 19 U.S.C. § 1673a(c)(1)(A)(ii); see also NTN Bearing Corp., 15 CIT at 80, 757 F. Supp. at 1430 ("It is the function of [Commerce] to determine standing[.]").[8] Where, as here, Commerce's determination is supported by substantial evidence, the Court will affirm.

Moreover, the Court notes the limited time frame within which Commerce must make its determination. As noted, the statute requires that Commerce determine whether "the petition has been filed by or on behalf of the industry" within twenty days of its filing. See 19 U.S.C. § 1673a(c)(1)(A). The Statement of Administrative Action also indicates Congress's intention under the URAA to "streamline" the process of determining industry support for a petition to resolve the matter "conclusively at the outset of a proceeding[.]" See Statement of Administrative Action, H.R. Doc. No. 103-316, 103d Cong., 2d Sess. (1994) at 861-62.[9] Therefore, in

---

[8]Although NTN Bearing was decided before the enactment of the URAA, the statutory definition of "domestic like product" has not changed. Therefore, the decision still has precedential value.

[9]The Statement of Administrative Action represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements . . . ." H.R. Doc. No. 103-316, 103d Cong., 2d Sess. at 656 (1994). "[I]t is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement." Id. (quoted in Delverde, SrL v. United States, 21 CIT ___, ___, 989 F. Supp. 218, 229-30 n.18 (1997)).

reviewing the standing determination, the Court is mindful of Commerce's statutory mandate to make an expedited finding.  See Matson Navigation Co., Inc. v. Federal Maritime Comm'n, 959 F.2d 1039, 1043 (D.C. Cir. 1992)(holding that, because Congress "mandated strict time limits on the [Federal Maritime] Commission's decisionmaking process for general rate increases[,]" the agency was entitled "to an extra portion of deference in the review of its rate orders."); cf. Mitsubishi Heavy Industries, Ltd. v. United States, 21 CIT ___, ___, 986 F. Supp. 1428, 1432 (1997)("Given the time limits imposed on Commerce's initiation decision . . . , the Court finds that the procedures Commerce followed constituted a reasonable application of the statute and therefore, that the scope definition upon which it based its industry support determination was in accordance with law.").

Here, Cray filed its petition on July 29, 1996.  See Initiation Notice at 43,528.  The SAA provides that where,

> [A] petition provides sufficient evidence that domestic producers or workers accounting for more than fifty percent of total domestic production of the domestic like product expressly support the petition, Commerce will determine, on the basis of evidence contained in the petition, that the petition is filed 'by or on behalf of the domestic industry.'

SAA at 862.  Therefore, Congress specifically gave Commerce the authority to make its standing determination on the basis of the evidence contained in the petition alone.  Interested parties, however, may submit comments on the issue of industry support

pursuant to 19 U.S.C. § 1673a(c)(4)(E).  Here, Plaintiffs submitted
their initial comments on August 16, 1996--sixteen days after the
filing date--and additional comments on August 19, 1996--twenty-one
days after the filing date.  See Initiation Notice at 43,528.

The Court recognizes that the "strict time frames within which
to work may require an agency to make its decision on a record more
slender than desired and may render acceptable an unusually terse
explanation of reasoning."  Matson Navigation, 959 F.2d at 1043.
Here, Commerce had the full twenty days to review the petition and
was able to determine that the petition demonstrated sufficient
industry support on its face.  Commerce then had a mere four days,
at most, to review Plaintiffs' comments, yet Commerce did consider
them, finding that they were insufficient to warrant a different
conclusion.  See Initiation Notice at 43,528-529.

That Fujitsu "can point to evidence of record which detracts
from . . . [Commerce's] decision and can hypothesize a reasonable
basis for a contrary determination is neither surprising nor
persuasive."[10]  Matsushita Elec. Indus. Co. v. United States,  3
Fed. Cir. (T) 44, 54, 750 F.2d 927, 936 (1984).  The Court must
determine whether the record contains "such relevant evidence as a
reasonable mind might accept as adequate to support [Commerce's]

---

[10]We emphasize that Fujitsu, the respondent to the underlying
investigation, alone has expressed opposition to the petition.  The
Court notes that not a single domestic producer of supercomputers
has expressed opposition to the petition.  Cf. Mitsubishi, 21 CIT
at ___, 986 F. Supp. at 1432.

conclusion." <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938). The possibility of drawing two inconsistent conclusions from the evidence does not prevent [Commerce's] finding from being supported by substantial evidence. <u>See</u> <u>Consolo v. Federal Maritime Comm'n</u>, 383 U.S. 607, 620 (1966)(citations omitted); <u>see also</u> <u>Shieldalloy Metallurgical Corp. v. United States</u>, 21 CIT ___, ___, 975 F. Supp. 361, 364 (1997)("It is not the Court's role . . . to reweigh the evidence; rather the Court insures that Commerce's determinations are supported by substantial evidence.").

### Conclusion

Commerce's domestic like product determination is supported by substantial evidence and is in accordance with law. Therefore, Commerce's determination of industry support for the petition is sustained, and this case is dismissed. Judgment will be entered accordingly.

<br>

_____
Donald C. Pogue, Judge

<br>

Dated:     January 27, 1999
           New York, New York