**Slip Op. 01-75**

## UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Judge Judith M. Barzilay**

| | | |
|---|---|---|
| TITANIUM METALS CORPORATION, | **:** | |
| Plaintiffs, | **:** | |
| v. | **:** | |
| THE UNITED STATES, | **:** | |
| Defendant, | **:** | |
| and | **:** | **Court No. 98-09-02847**<br>Public Version |
| ZAPOROZHYE TITANIUM &<br>MAGNESIUM COMBINE, | **:** | |
| | **:** | |
| THE MINISTRY OF INDUSTRIAL<br>POLICY OF THE GOVERNMENT OF<br>UKRAINE, | **:** | |
| | **:** | |
| AVISMA TITANIUM-MAGNESIUM<br>WORKS, | **:** | |
| RMI TITANIUM COMPANY, | **:** | |
| UST-KAMENOGORSK TITANIUM<br>AND MAGNESIUM PLANT, | **:** | |
| | **:** | |
| SPECIALTY METALS COMPANY, | **:** | |
| TMC TRADING INTERNATIONAL,<br>LTD., | **:** | |
| and | **:** | |
| TMC USA, INC., | **:** | |
| Defendant-<br>Intervenors. | **:** | |

[Plaintiff's motion for judgment on the agency record denied.]    Decided: June 22, 2001

*diKieffer & Horgan, (J. Kevin Horgan), Donald E. diKieffer*, for Plaintiff Titanium Metal Corporation.

*Lyn M. Schlitt,* General Counsel, *James A. Toupin,* Deputy General Counsel, *(Robin L. Turner),* Office of the General Counsel, U.S. International Trade Commission, for Defendant.

*Aitken Irvin Lewin Berlin Vrooman & Cohn, (Bruce Aitken, Kieran Sharpe),* for Defendant-Intervenors Zaporozhye Titanium and Magnesium Combine and the Ministry of Industrial Policy of Ukraine.

*Wilmer, Cutler & Pickering, (John D. Greenwald)*, *Leonard Shambon*, for Defendant-Intervenors Avisma Titanium-Magnesium Works and RMI Titanium Company.

*Squire, Sanders & Dempsey, L.L.P., (Ritchie T. Thomas), Heidi Duncan,* for Defendant-Intervenors Ust-Kamenogorsk Titanium and Magnesium Plant and Specialty Metals Company.

*LeBoeuf, Lamb, Greene & MacRae (Melvin S. Schwechter), William C. Sjoberg,* for Defendant-Intervenor TMC Trading International, Ltd. and TMC USA, Inc.

**OPINION**

**BARZILAY, JUDGE:**

## I. INTRODUCTION

Plaintiff, Titanium Metals Corp., ("TIMET") is one of two companies that produce titanium sponge in the United States.  TIMET is an integrated producer of titanium products, including titanium sponge, ingots and mill products for use in aerospace, industrial and consumer products.  TIMET challenges the United States International Trade Commission's ("ITC" or "Commission") determination to revoke the antidumping duty orders on titanium sponge from Japan, Kazakhstan, Russia and Ukraine

pursuant to 751(b) of the Tariff Act of 1930, *as amended*, 19 U.S.C. § 1675(b)(1994).[1]  The ITC's

determination to revoke the antidumping duty order was based on the Commission's finding that

circumstances have changed such that revocation of the orders would not likely lead to continuation or

recurrence of material injury to a domestic industry in the United States within a reasonably foreseeable

time.  TIMET asserts that the Commission's determination is wrong and requests a remand for further

investigation.  The court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c)(1994).[2]

## II. BACKGROUND

This litigation concerns the antidumping duty orders issued against Kazakhstan, Russia, Ukraine

and Japan.  In 1968, the Department of the Treasury, whose duties and functions were transferred to

the United States Department of Commerce ("Commerce") in 1980, found that titanium sponge from

the U.S.S.R. was being sold at less than fair value ("LTFV") and was causing material injury to the

domestic titanium sponge industry.  *See Titanium Sponge from the U.S.S.R.*, 33 Fed. Reg. 12138

(August 28, 1968).  In 1992, following the breakup of the former Soviet Union, Commerce adjusted

the antidumping finding and issued 15 separate antidumping duty orders covering the independent

states, all of which were subsequently revoked except those against Kazakhstan, Russia and Ukraine.

In 1984, the ITC determined that the domestic titanium industry was threatened with material injury due

to LTFV imports of titanium sponge from Japan, and Commerce issued an antidumping duty order

covering these imports from two companies, Toho Titanium ("Toho") and Osaka Titanium,  now doing

---

[1]Notice of the Commission's determination was published at *Titanium Sponge from Japan, Kazakhstan, Russia, and Ukraine*, 63 Fed. Reg. 43414 (August 13, 1998).

[2]28 U.S.C. § 1581(c) provides: "The Court of International Trade shall have exclusive jurisdiction of any civil action commenced under section 516A of the Tariff Act of 1930."

business as Sumitomo Sitix. *See Antidumping Duty Order: Titanium Sponge from Japan*, 49 Fed.

Reg. 47053 (Nov. 30, 1984). This order was subsequently revoked as to Sumitomo Sitix; the

antidumping duty order therefore applied only to Toho.

On December 9, 1997, TMC Trading International Ltd. and TMC USA, Inc. (collectively

"TMC") filed a petition under 19 U.S.C. § 1675(b), asking that the antidumping duty order against

Russia be revoked due to changed circumstances. *See Titanium Sponge from Japan, Kazakhstan,*

*Russia and Ukraine*, 62 Fed. Reg. 68300 (Dec. 31, 1997). As a result, the ITC initiated a changed

circumstances review as to titanium sponge from Russia, and self-initiated changed circumstances

reviews of the antidumping orders on Japan, Kazakhstan, and Ukraine. *See Titanium Sponge from*

*Japan, Kazakhstan, Russia and Ukraine*, 63 Fed. Reg. 13873 (March 23, 1998).

Section 751 of the Tariff Act of 1930, codified at 19 U.S.C. § 1675 (b)(2), provides that in a

changed circumstances review the ITC shall "determine whether revocation of the order or finding is

likely to lead to a continuation or recurrence of material injury. . . ." In making this determination, the

Commission "shall consider the likely volume, price effect, and impact of imports of the subject

merchandise on the industry if the order is revoked or the suspended investigation is terminated." 19

U.S.C. § 1675a(a)(1). The Commission is required to take into account

> (A) its prior injury determinations, including the volume, price effect, and impact of
> imports of the subject merchandise on the industry before the order was issued or the
> suspension agreement was accepted,
> (B) whether any improvement in the state of the industry is related to the order or the
> suspension agreement, (and)
> (C) whether the industry is vulnerable to material injury if the order is revoked or the
> suspension agreement is terminated . . . .

*Id.*

By a vote of 3-0, the ITC determined that revocation of the antidumping duty orders was not

likely to lead to continuation or recurrence of material injury to the domestic titanium sponge industry.

*See Titanium Sponge from Japan,, Kazakhstan, Russia and Ukraine*, USITC Pub. 3119, Inv. Nos. 751-TA-17-20 (August 1998) ("*Determination*").[3]  All three Commissioners comprising the Commission at the time found the like product to be titanium sponge and defined the domestic industry as the domestic producers of titanium sponge.  Under 19 U.S.C. § 1675a(a)(7), the Commission has the discretion to determine whether to cumulate imports if certain circumstances are met in a changed circumstances review, but is not permitted to cumulate imports likely to have no discernible adverse impact on the domestic industry.  The Commission majority found that as there were [

] from Ukraine during the period of investigation ("POI"), and as there was little likelihood of significant Ukraine production and little likelihood of any Ukrainian titanium sponge being imported into the United States, Ukrainian imports were likely to have no discernible adverse impact on the domestic industry.[4] Hence, the Commission elected not to cumulate Ukraine imports.[5]

In its determination, the Commission found several relevant conditions of competition.  First, the ITC found that worldwide and domestic titanium sponge capacity had declined significantly.  *See*

---

[3]All cites and page numbers refer to the confidential version of the *Determination*.

[4]According to TIB regulations, articles brought into the United States temporarily and pursuant to Chapter 98, Subchapter XIII, Harmonized Tariff Schedule of the United States ("HTSUS"), may qualify for TIB entry without payment of duties if a bond is posted in an amount equal to twice the estimated duties, including any applicable antidumping duties, that would apply were the imported articles entered for consumption in the United States. *See* 19 C.F.R. § 10.31 (1997).

[5]Chairman Bragg and Vice Chairman Miller filed joint views and cumulated imports from Japan, Kazakhstan and Russia, but did not cumulate imports from Ukraine.  Commissioner Crawford did not cumulate imports from any of the subject countries and filed separate views on the remaining issues.

*Determination* at 17. Another condition of competition was a lack of open market sales. *See id. at 18.* Additionally, the Commission found that United States demand for titanium sponge was derived from demand for downstream titanium metal products produced from titanium sponge. *See id.* at 19. "The composition of demand for titanium mill products has shifted significantly from the military aerospace segment to the commercial aerospace and non-aerospace segment since the prior titanium sponge investigations," indicating greater stability in the titanium sponge market. *Id.* at 20. The Commission further found that a substantial increase in long-term supply contracts for titanium sponge and titanium mill products protected the domestic industry from demand swings and was likely to protect domestic sponge producers in the future. *See id.* at 22-23. Moreover, "[a]pparent U.S. consumption . . . more than doubled from 1995 to 1997," and the ITC found that "demand [was] likely to remain strong in the foreseeable future." *Id.* at 21. Finally, the Commission noted that while the substantial number of TIB imports were not themselves considered subject imports, they were considered a partial indicator of the potential increase in the volume of titanium sponge that would be exported to the U.S. in the future were the antidumping duty orders to be revoked. *See id.* at 23-24.

The Commission "evaluat[ed] the likely volume of imports of subject merchandise if the orders under review [were] revoked, finding that the combined cumulated subject imports and TIB imports from subject sources were unlikely to increase substantially if the orders were revoked. *Id.* at 25, 27. The ITC predicted that the domestic titanium sponge producers would continue to account for a significant share of the imports of titanium sponge due to long term supply contracts to import or

purchase titanium sponge from subject sources.[6]  Regarding the likely price effects of subject imports,

the Commission found that because the domestic industry sold only about [        ] of its total

production from 1995 to1997 on the open market, any changes in prices of imported product would

have little direct effect on the prices of the domestic like product or impact on the domestic industry.

*See id.* at 30.

The Commission did not find that the record supported a conclusion that the domestic industry

was threatened with material injury.  *See id.* at 32.  As the Commission stated,

> Virtually all domestic industry performance indicators increased from1995 to 1997.
> Production steadily increased from 1995 to 1997.  Capacity utilization followed a
> similar pattern.  Employment steadily increased from 1995 to 1997. The domestic
> producers' titanium products operations [
>                                                                       ].  Inventory as a share of shipments
> steadily declined during the period of investigation.

*See id.* at 32-33 (citations omitted).   The Commission acknowledged the domestic producers'

arguments that the titanium industry was about to experience a sharp decline in the business cycle, and

that prices would drop, forcing the producers to reduce their domestic production of titanium sponge.

---

[6]In determining the likely volume of imports of subject merchandise if the order is revoked, the
Commission considers "all relevant economic factors," including

> (A) any likely increase in production capacity or existing unused production capacity in
> the exporting country,
> (B) existing inventories of the subject merchandise, or likely increases in inventories,
> (C) the existence of barriers to the importation of such merchandise into countries other
> than the United States, and
> (D) the potential for product-shifting if production facilities in the foreign country, which
> can be used to produce the subject merchandise, are currently being used to produce
> other products.

19 U.S.C. § 1675a(2)(A)-(D).

*See id.* at 33.  However, the Commission determined that the domestic industry was unlikely to face the

"make or buy" dilemma in the foreseeable future, but that imports would continue to satisfy the domestic

demand that could not be met by domestic producers.[7]

Finally, regarding the cumulation of Ukraine imports with other subject imports, the

Commission found [                                                                                     ] from the

Ukraine.  *See id.* at 34.  Additionally, the ITC noted that significant imports from Ukraine of titanium

sponge were not likely within a reasonably foreseeable time. *See id.*  Thus, "revocation of the

antidumping duty order against Ukraine would not be likely to lead to continuation or recurrence of

material injury to the domestic industry within a reasonably foreseeable time."*Id.*

TIMET moved for judgment on the agency record pursuant to USCIT R. 56.2.  The ITC filed

a memorandum opposing TIMET's motion, and briefs opposing Plaintiff's motion were filed by

Defendant-Intervenors Ust-Kamenogorsk Titanium and Magnesium Plant and Specialty Metals

Company, S.A., RMI Titanium Company, and the Ministry of Industrial Policy of Ukraine and

Zaporozhye Titanium and Magnesium Combine.

### III.  STANDARD OF REVIEW

The court will uphold the ITC's determination in a changed circumstances review unless it is

unsupported by substantial evidence on the record or otherwise not in accordance with law.  *See* 19

U.S.C. § 1516a(b)(1)(B) (1994).  Substantial evidence is "more than a mere scintilla;" it is "such

---

[7]The "make or buy" dilemma occurs when import prices decline so that integrated producers find it economically necessary to purchase material for their downstream production from imported sources.  The lower import prices thus cause integrated producers to reduce their captive production, thereby harming overall domestic production.

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938); *Matsushita Elec.*

*Indus. Co., Ltd. v. United States,* 750 F.2d 927, 933 (Fed. Cir. 1984).  The court noted, "[i]n

applying this standard, the court affirms [the agency's] factual determinations so long as they are

reasonable and supported by the record as a whole, even if there is some evidence that detracts from

the agency's conclusions." *Olympia Indus., Inc. v. United States*, 22 CIT 387, 389, 7 F. Supp. 2d

997, 1000 (1998) (citing *Atlantic Sugar, Ltd. v. United States*, 744 F. 2d 1556, 1563 (Fed. Cir.

1984).

The court may not reweigh the evidence or substitute its own judgment for that of the agency.

*See Granges Metallverken AB v. United States*, 13 CIT 471, 474, 716 F. Supp. 17, 21 (1989)

(citations omitted).  Additionally, "absent some showing to the contrary, the agency is presumed to have

considered all of the evidence in the record." *See Nat'l Ass'n of Mirror Mfrs. v. United States*, 12

CIT 771, 779, 696 F. Supp. 642, 648 (1988) (citations omitted).  Thus, "[t]o prevail under the

substantial evidence standard, a plaintiff must show either that the Commission has made errors of law

or that the Commission's factual findings are not supported by substantial evidence." *Id*. at 774, 696 F.

Supp. at 644.

## IV. DISCUSSION

In support of its *Motion for Judgment on the Agency Record*, TIMET asserts five points.

First, Plaintiff claims that the ITC failed to correctly presume that dumping would resume if the

antidumping duty orders were revoked.  Second, TIMET asserts that the Commission erred by failing

to impose the proper burden of persuasion on the parties requesting revocation.  Third, the ITC erred

by determining that the domestic industry is unlikely to be faced with a "make or buy" dilemma in the reasonably foreseeable future. Fourth, the Commission improperly determined that the "extreme business cycles" experienced by the domestic industry were not likely to recur. Fifth, TIMET claims that the Commission erred in determining that imports of titanium sponge from Ukraine would likely have no discernible impact on the domestic industry. For the reasons set out in the following opinion, the court is not persuaded by Plaintiff's arguments and denies Plaintiff's motion.

*A.*      *The ITC properly applied the presumption of dumping in reviewing the antidumping duty order.*

Plaintiff states that the Commission is required to presume irrebuttably that dumping will resume if the antidumping duty orders are revoked. In support of this assertion, Plaintiff cites *American Permac, Inc. v. United States,* in which the court stated, "[f]or purposes of investigations under section 751(b), the ITC must assume that dumping will resume if the antidumping duty order is revoked or canceled." 831 F. 2d 269, 274 (Fed. Cir. 1987). Plaintiff correctly notes that the rationale for the presumption is that a party seeking a changed circumstances review may seek relief in one of two ways. First, it may seek review by Commerce on the question of LTFV sales, and if Commerce finds LTFV sales or the likelihood thereof, the plaintiff may then request from the ITC a determination that material injury will not result. Alternatively, the plaintiff may forego review by Commerce and request a determination directly from the ITC that there is no material injury or threat of material injury. *See Matsushita Elec. Indus. Co., Ltd. v. United States*, 6 CIT 25, 27-28, 569 F. Supp. 853, 856-57 (1983). As the *Matsushita* court explained, in the latter instance, "[w]hat the ITA thought about the likelihood of future sales at less than fair value, was unknown to the ITC and that unknown factor must operate as a presumption in the ITC's review." *Id.* at 27, 569 F. Supp. at 856. Plaintiff states that this

rationale for the presumption of dumping was endorsed by Congress when 19 U.S.C. § 1677(35)(c)(1994) was enacted, concluding that as there have been no dumping margins determined by Commerce in a changed circumstances review or a sunset review, "the Commission was required to use the final rates from the original antidumping investigation for all parties in assessing the likely impact of revocation of the orders." *Br. in Supp. of Pl.'s Mot. for J. on the Agency R ("Pl.'s Br.")* at 6. The court does not agree.

Plaintiff is correct that in a changed circumstances review, the Commission begins its analysis with the presumption that dumping will resume if the antidumping duty order is revoked. *See* 19 U.S.C. § 1675a(a)(1). However, a presumption of dumping does not require that the Commission consider the size of the dumping margin. *See* 19 U.S.C. § 1675a(a)(6). The court's analysis in *Eveready Battery Co., Inc., v. United States*, 23 CIT ___, 77 F. Supp. 2d 1327 (1999) is instructive on this point. In that case, the plaintiff appealed the ITC's denial of its request for a changed circumstances review of an antidumping duty order on electrolytic manganese dioxide. *See id.* at ___, 77 F. Supp.2d at 1328. The court held that the request for changed circumstances review was rendered moot by the institution of an automatic sunset review.[8] In its opinion, the court clarified the statutory language:

---

[8]The Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994) created a provision wherein Commerce and the ITC are required to automatically conduct a five-year review, or "sunset review" of an antidumping duty order. *See* 19 U.S.C. § 1675(c)(1). Pursuant to statute, Commerce and the ITC must determine whether revocation of the order would be likely to lead to continuation or recurrence of dumping and material injury. *See id.* According to the Statement of Administrative Action ("SAA") accompanying the URAA, "[a]utomatic initiation (of sunset reviews) will avoid placing an unnecessary burden on the domestic industry and promotes efficiency of administration. . . ." SAA at 879, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4205.

> [I]n determining the likelihood of the continuation or recurrence of injury under sections 1675(b) and (c), the Commission has discretion whether to consider the magnitude of the margin of dumping . . . . While Commerce under 19 U.S.C. § 1675a(c)(3) is to provide the Commission with information on the likely dumping margin in the event of cessation of antidumping duty discipline, the Commission is not required to consider the margin in making its determination as to whether there is likely to be a continuation or recurrence of injury.

23 CIT at ___, 77 F. Supp. 2d at 1332 (citations omitted). *See also Iwatsu Elec. Co. v. United States*, 15 CIT 44, 48, 758 F. Supp. 1506, 1510 (1991) (stating that the statutory language does not "require that ITC demonstrate that dumped imports, through the effects of particular margins of dumping, are causing injury. Rather, ITC must examine the effects of imports of a *class* or *kind* of merchandise which is found to be sold at LTFV and make its conclusion about causation accordingly").

If the agency does elect to consider the magnitude of the dumping margin in its analysis, the statute gives three choices as to the margin to be used:

> Specifically, for a changed circumstances review, 19 U.S.C. § 1677(35)(C)(iii) defines the margin of dumping which may be used by the Commission as:

>> the most recent dumping margin or margins determined by the administering authority under section 1675a(c)(3) of this title if any, or under section 1673b(b) [preliminary determination by Commerce] or 1673d(a) [final determination by Commerce] of this title.

*Eveready*, 23 CIT at ___, 77 F. Supp. 2d at 1333 (citing 19 U.S.C. § 1677(35)(C)(iii)). Additionally, the SAA provides: "the statute defines the magnitude of the dumping margin for purposes of the Commission's analysis as 'in a changed circumstances review, the margin(s) most recently determined by Commerce. . . .'" *Id.* (quoting SAA at 851, 1994 U.S.C.C.A.N. at 4184).

The evidence cited by Plaintiff does not prove that the ITC failed to properly apply the presumption of dumping in this instance. Plaintiff claims that the Commission relied on the "wrong

margins of dumping," citing the Staff Report to the Commission which estimated that revocation of the antidumping duty orders would have no direct effect on prices or volumes of imports on the domestic industry.  *See Pl.'s Br.* at 7.  Plaintiff also cites an internal memorandum detailing Commerce's instructions to the Commission to use the dumping margins from the most recent administrative reviews in its injury analysis, and the treatment of imports from Sumitomo Sitix of Japan as nonsubject imports, as evidence of the ITC's failure to properly apply the presumption of dumping.

As the court has previously indicated and as Defendant correctly notes, in an original investigation "the real question addressed to ITC by the statute is what effect imports in a class of merchandise sold at LTFV have on the domestic industry producing the 'like' product." *Algoma Steel Corp. v. United States*, 12 CIT 518, 524, 688 F. Supp. 639, 645 (1988).  Similarly, in a changed circumstances review, the "real question" is what effect revocation of an antidumping duty order will have on the domestic industry producing that product.  In making such a determination, the Commission is required to consider volume, price effect, and impact of imports of the subject merchandise on the industry if the order is revoked.  Yet, as noted above, the Commission need not consider the magnitude of the dumping margin.  Furthermore, if it chooses to do so, it is not required to use the original antidumping duty margins.  *See* 19 U.S.C. § 1675a(a)(6).  In this instance, two of the three Commissioners apparently chose not to consider any specific margin rate, as the statue permits.  Commissioner Bragg explicitly explained that she does not consider the dumping margin particularly significant or helpful. *See Determination* at 16  n. 73.[9]  Therefore, the Commission's application of the

---

[9]Although Commissioner Crawford does discuss the margin rates in her analysis of the price effects of the subject imports on the domestic industry, she does not rely on them to conclude that there would likely be no significant effect on domestic prices if the order was revoked.  Instead, her focus is on the relationship between demand for the product in the United States industry and import prices.

presumption of dumping was in accordance with law.

B.     *The Commission correctly applied the proper burden of persuasion.*

The statute provides that in a changed circumstances review, "the party seeking revocation of

an order or finding . . . shall have the burden of persuasion with respect to whether there are changed

circumstances sufficient to warrant such revocation. . . ." 19 U.S.C. § 1675(b)(3)(A).  Plaintiff states

that this burden of persuasion is essentially a burden of proof, wherein the party bearing the burden

must meet it with respect not only to the ultimate conclusion but also with respect to all subsidiary

questions supporting the ultimate conclusion.  *See Pl.'s Br.* at 11 (citing *United States v. New York*

*Merchandise Co.*, 435 F. 2d 1315, 1319 (CCPA 1970)).  As such, Plaintiff claims that the ITC did

not impose a burden of persuasion on the parties seeking revocation of the orders, as evidenced by,

*See Views of Commissioner Carol T. Crawford* at 2 (stating that as concerns Japanese imports, "given the current and projected strong demand for titanium sponge, it does not seem likely that there is any commercial incentive to reduce prices of subject imports"); *Id.* at 6 (noting that regarding Kazakh imports, "the demand for titanium sponge from Kazakhstan likely will not be affected by the revocation of the order, and thus prices for titanium sponge from Kazakhstan are not likely to decrease significantly if the order is revoked"); *Id.* at 8, (stating that regarding any potential production capacity for titanium sponge by Ukraine, "the Ukrainian producer plans to attain the capacity to produce [6,250] metric tons and has already received requests from non-U.S. purchasers for four times its ultimate capacity").

Were the court to determine that Commissioner Crawford relied on the incorrect dumping margin, because two out of three participating Commissioners voted affirmatively to revoke the antidumping duty orders, that error would be harmless.  19 U.S.C. § 1677 (11) provides for affirmative determinations by a divided Commission:

> If the Commissioners voting on a determination by the Commission, including a determination under section 1675 of this title, are evenly divided as to whether the determination should be affirmative or negative, the Commission shall be deemed to have made an affirmative determination.

As the votes were not evenly divided, but two thirds of the participating Commissioners voted affirmatively to revoke the antidumping duty order, the Commission is clearly deemed to have made an affirmative determination in this instance.

among other factors, "1) the Commission's determination that the boom/bust cyclical history of the titanium sponge industry was not likely to recur; and 2) the Commission's failure to presume that future prices would decline despite the fact that the information collected by the Commission regarding future pricing was inconclusive." *Pl.'s Br.* at 11.

The court agrees with Defendant that Plaintiff's allegations "fail to recognize the burden to be applied as defined by Congress." *Def. ITC's Mem. in Opp. to Pl.'s Mot. for J. Upon the Agency R. ("Def.'s Br.")* at 15. As Defendant notes, Congress added the burden of persuasion language to the statute to clarify that

> [t]he party seeking revocation of the order has a burden of persuasion, in the sense that at the end of the investigation, the ITC must be convinced that revocation of the order is appropriate. In short, the ITC must determine that, in light of the "changed circumstances," the revocation of the order will not result in material injury or threat of material injury to the U.S. industry.

H.R. CONF. REP. NO. 98-1156, at 182-83 (1984).

The court cannot agree with Plaintiff that the burden of persuasion is equivalent to a burden of proof. The "burden of persuasion" language was enacted into law to ensure that the domestic industry was not put in the position of having to justify why an existing order was still necessary in a changed circumstances review investigation conducted by the Commission. Rather, the party requesting revocation of the order due to changed circumstances was given the burden to persuade the Commission why it should be revoked. Congress, in effect, was ensuring through legislation that the Commission placed the appropriate focus on its analysis in a changed circumstances review investigation. The importers' burden in this case was to persuade the Commission that revocation of the order would not likely lead to material injury. It is the ITC, in turn, that weighs the evidence and makes

its determination. "As trier or fact, the Commission must assess the quality of the evidence and give such weight to the evidence that it believes is justified." *Floral Trade Council v. United States*, 20 CIT 595, 601, 1996 WL 276957, at *6 (CIT May 17, 1996) (citing *Iwatsu,* 15 CIT at 47, 758 F. Supp. at 1509). *See also Matsushita,* 750 F. 2d. at 933 ("The Commission's decision does not depend on the 'weight' of the evidence, but rather on the expert judgment of the Commission based on the evidence of record.").

Plaintiff has not proved to the court that the burden was not met. The court notes the "deficiencies" cited by Plaintiff: the failure of the Commission to verify information submitted by the parties seeking revocation of the antidumping duty orders, the determination that the cyclical patterns of demand in the titanium sponge industry were unlikely to continue, and the failure of the Commission to draw firm conclusions regarding market pricing of titanium sponge. However, the Commission considered a very detailed record regarding market trends and industry supply and demand which it weighed and used to support its determination. It included industry forecasts supplied by parties on both sides of the issue, information from industry sources, including purchasers of titanium sponge and purchasers of downstream titanium mill products, information from government experts about the history and future of the industry, and questionnaire responses and briefing papers from all domestic producers of titanium sponge and from subject foreign producers. *See Determination* at 20-22. The Commission's determination did not disregard the cyclical history of the titanium sponge industry, as Plaintiff alleges. *See id.* at 33. The Commission found important shifts in demand from military to non-military users supporting its conclusion that demand cycles will be less important in the future. *See id.* at 20. The Commission also found current price comparisons not to be conclusive. As domestic

producers sold only a very small amount of sponge on the open market, and as transactions showed differences in product grades/quality or sales terms between domestic and imported products, only limited pricing comparisons were possible. *Id.* at 30.

Plaintiff has failed to show that the importers in this changed circumstances review were held to an incorrect burden with respect to their statutory responsibility under 19 U.S.C. § 1675(b)(3)(A). There is substantial record evidence to support even those conclusions specifically challenged by Plaintiff -- the demand cycle and pricing comparison issues. The Commission properly weighed the evidence and made a reasonable determination that revocation of the antidumping duty orders would not likely lead to recurrence of material injury.

C.      *The Commission Properly Found that Domestic Producers Would Not Face "Make or Buy" Decisions in the Foreseeable Future.*

In its determination, the ITC decided that the record did not support a finding that a "make or buy" dilemma would arise in the reasonably foreseeable future. *See Determination* at 33. Plaintiff alleges that this determination is not supported by substantial evidence on the record or otherwise in accordance with law because the ITC failed to consider the impact of unfairly priced imports on captive production. Defendant counters that while not required to do so, the ITC gave adequate consideration to Plaintiff's "make or buy" argument, reasonably concluding that the domestic producers would not face such a situation in the reasonably foreseeable future. The court agrees with the ITC, and rejects Plaintiff's claim.

According to Plaintiff, the ITC was required to consider the effect of unfairly priced imports on captive production in its analysis of material injury; had the ITC done so, it would have agreed with Plaintiff's argument that the domestic producers would face the "make or buy" decision in the

foreseeable future.   In support of its argument, Plaintiff cites 19 U.S.C. §1677(7)(C)(iv), which

prescribes the circumstances under which the ITC may disregard captive production in its injury

analysis:

> If domestic producers internally transfer significant production of the domestic like
> product for the production of a downstream article and sell significant production of the
> domestic like product in the merchant market, and the Commission finds that
>> . . .
>> (III) the production of the domestic like product sold in the merchant market is
>> not generally used in the production of that downstream article,
>
> then the Commission, in determining market share and the factors affecting financial
> performance. . . shall focus primarily on the merchant market for the domestic like product.

Plaintiff then states that this exception to the rule requiring consideration of captive production does not

apply in this instance because the facts indicate that titanium sponge is used to produce the same

downstream articles.  Plaintiff argues that consideration of imports on captive production would have

required the Commission to find that integrated domestic producers of titanium products will face the

"make or buy" decision in the foreseeable future if the antidumping orders are revoked.  Plaintiff bases

this argument in part on its erroneous contention that, in assuming the fact of dumping, the ITC must

take into account the price differential at the substantial margins of the original investigation.  *See supra*

Part IV. A.

Defendant counters correctly in that the captive production provision does not apply to a

changed circumstances review, but that the Commission is not precluded from considering a significant

degree of captive production as a condition for competition.  *See U.S. Steel Group v. United States,*

18 CIT 1190, 1198, 873 F. Supp. 673, 684 (1994).  Thus, while the ITC may exercise its discretion

to consider captive production in its material injury analysis, Plaintiff's argument that the ITC is required

to consider such captive production is incorrect.

In either event, Defendant adequately addressed Plaintiff's allegations that the domestic industry faced a "make or buy" dilemma and concluded that the record did not support the finding that such a dilemma would arise in the reasonably foreseeable future. The Commission first defined the domestic industry as including all producers of the domestic like product, whether toll-produced, captively consumed, or sold in the domestic merchant market. *See id.* at 3. As one of the conditions of competition distinctive to the affected industry, the Commissioners considered the impact of captive consumption in its analysis of material injury by subject imports if the antidumping duty orders were to be revoked. *See id.* at 18. The Commission found that "there are virtually no open market sales by domestic producers." *Id.* (citations omitted). Rather, the two primary domestic producers of titanium sponge are integrated titanium mill products producers that captively consume most of the titanium sponge that they produce. *See id.* Additionally, the Commission found that a significant amount of the domestic producers' non-captive shipments were attributable to long-term contracts or toll arrangements, and were thus insulated from import competition. *See id.* at 18-19. Thus, the Commission found that "the record reflects that the domestic industry has increased titanium sponge production to meet some internal needs and not demonstrated an interest in competing in the merchant market in a significant way despite the existence of the antidumping orders."*Id.* at 19.

Plaintiff's claim is based on a prediction that demand would decline in the future, and that imported sponge would therefore be available at substantially reduced prices. The Commission rejected that prediction, basing its determination instead on its forecast that demand would likely remain strong. Thus, rather than being placed in the position of determining whether to import sponge or make

it, imports would continue to supply domestic titanium sponge producers in their downstream titanium

mill product operations, not as a substitute for their domestic production of sponge, but as an additional

needed source of supply for their internal demand that could not be met with domestic production.  The

Commission did appropriately consider captive production and Plaintiff's concern regarding the "make

or buy" dilemma.  Its determination is supported by substantial evidence in the record.

D.      *The Commission's Determination that the Business Cycles Experienced by the Domestic*
        *Industry are not likely to Recur and that Demand for Titanium Sponge is Likely to*
        *Remain High is Supported by Substantial Evidence.*

        Plaintiff claims that the Commission improperly determined that the titanium industry's history of

boom/bust cycles, wherein periods of strong demand have been followed by periods of steep declines

in demand and prices, would not continue in the future.  According to Plaintiff, evidence in the record

clearly established that a downcycle for titanium sponge was likely in the foreseeable future, and that the

Commission erred in its determination that the industry was unlikely to experience another cyclical

downturn.  The court holds that the Commission's determination is supported by substantial evidence.[10]

        Plaintiff claims that "[h]istory, recent developments in the titanium and aerospace markets, and

the projections of independent forecasters submitted to the Commission all indicated a sober future in

which excess world sponge capacity and declining demand would exert downward pressure on titanium

sponge prices." *Pl.'s Br.* at 17.  Plaintiff further cites evidence of significant aircraft production cutbacks

caused by Asian financial crises, announced by Boeing after the Commission's hearing on changed

circumstances, that should have been included in the report to the Commission and in the Commission's

---

[10]As Defendant correctly notes, "[b]y statute, Congress has allocated to the Commission the task of making these complex determinations.  Ours is only to review those decisions for reasonableness." *U.S. Steel Group v. United States*, 96 F. 3d 1352, 1357 (Fed. Cir. 1996).

analysis.[11]  Additionally, Plaintiff states that while "the parties seeking revocation proffered an assortment of new applications for titanium products," the benefits of these emerging markets are speculative.  *Pl.'s Br.* at 18-19.  Therefore, Plaintiff contends, evidence showed that the boom/bust history of the titanium industry was likely to continue.

The Commission clearly considered and weighed the evidence in the record; its determination that demand for titanium sponge will remain strong in the future is supported by substantial evidence. The Commission based its conclusion on a number of detailed industry forecasts for titanium demand, including forecasts by Boeing, Forecast International, and Airline Monitor.  Indeed, as the Commission stated, "[t]he forecast for titanium metal demand submitted by Boeing Company, which was prepared by Boeing in conjunction with TIMET and other members of the titanium industry, shows titanium consumption increasing from 17 million pounds in 1997 to 28 million pounds in 1999 and 2000 and then declining to 25 million pounds in 2002." *Determination* at 21 (citations omitted).  Additionally, the Commission did acknowledge Boeing's announcement that it planned to reduce production, noting "[a]lthough domestic sponge producers argued that demand has softened in the last 3-6 months and is about to decline substantially, other record evidence does not support these arguments."  *Id.* at 22 n. 100.  The ITC cited a speech by the president of TIMET indicating that overall world demand for titanium mill products would increase by 17% from 60,000 metric tons in 1997 to 70,000 metric tons in 2004, and noted that the domestic sponge producers cited forecasts of aircraft production rather than titanium usage, which does not take into account the higher percentages of titanium used in newer

---

[11]Specifically, Boeing announced that production of aircraft would fall steadily from 536 planes in 1998 to 425 planes in 2001, that it would be cutting its output of 747 airplanes by 30% in 1999, that it would curtail its production of 777s.  Plaintiff notes that Boeing's announcements reflected the company's concern over slack demand for jets from buyers in Asia.

models, and the titanium used in refurbishing existing aircraft. *Id.* at 21-22.

The Commission found that the boom/bust cycle had lessened due to diversification of uses for titanium products, and was unlikely to return in the reasonably foreseeable future. While in 1968, the military aerospace segment of titanium sponge consumption accounted for about 75%, and the commercial aerospace segment accounted for 15 percent, in 1996, the total aerospace share was approximately 60 percent, with 15 percent held by the military aerospace segment and 45% held by the commercial aerospace segment. *See Titanium Sponge from Japan, Kazakhstan, Russia, and Ukraine*: Report to the Commission on Inv. Nos. 751-TA-17 through 20 (June 26, 1998) ("*Report*") at II-3. As the ITC notes, "Plaintiff does not dispute that there has been a shift for total demand for titanium mill products so that the aerospace segment's share has fallen from 90 percent to 60 percent or that there has been a shift within the aerospace segment from mostly military to mostly civilian. This shift within the aerospace segment reduces the industry's reliance on the extremely unpredictable government purchases." *Def.'s Br.* at 44-45. As such, the "evidence reasonably supports the Commission's conclusion that diversification in the uses of titanium is likely to diminish the cyclical patterns for demand experienced by the industry in the past." *Id.* at 46 (citations omitted). The Commission also considered that "[w]hile long-term contracts were used in the past, it appears that the number and duration of such agreements has increased. . . . [T]he existence of such agreements to purchase sponge does afford a greater protection from market fluctuations than no contracts at all." *Determination* at 22 n.101.

It is clear to the court that the Commission adequately weighed the evidence in the record before it and made a well-reasoned prediction that demand for titanium sponge was unlikely to decline.

The existence of any evidence in the record indicating a contrary conclusion does not refute that conclusion. Rather, under the substantial evidence standard, "[t]he Commission has the discretion to assess the probative nature of the evidence obtained in its investigation and to determine whether to discount the evidence or to rely on it." *Goss Graphic System, Inc. v. United States,* 22 CIT 983, 1002, 33 F. Supp 2d 1082, 1099 (1998).  Therefore, the court holds that the Commission's determination with regard to the demand cycle was supported by substantial evidence on the record.

E.      *The Commission's Determination that Imports of Titanium Sponge from Ukraine Would Likely Have no Discernible Adverse Impact on the Domestic Industry is Supported by Substantial Evidence and Otherwise in Accordance with Law.*

Plaintiff's final argument is that the Commission erred in determining not to cumulate imports from Ukraine with imports from Japan, Kazakhstan and Russia.  Plaintiff claims that the Commission's findings that imports from Ukraine were not likely to have a discernible adverse impact on the domestic industry, and that the revocation of the antidumping order on Ukrainian titanium sponge would not lead to a continuation or recurrence of injury to the domestic industry were based on misleading testimony. Accordingly, as the ITC has failed to verify any of the information or testimony submitted by the parties seeking revocation of the antidumping duty orders, Plaintiff asks the court to remand the matter to the Commission with instructions to reopen the record and determine the "true facts regarding the capacity and intentions of the Ukrainian sponge producer." *Pls.' Mem.* at 21- 22.  The court denied Plaintiff's request.

Refuting Plaintiff's claims,  the ITC states that it properly determined that any imports from Ukraine were not likely to have significant price effects or a significant adverse impact on the domestic industry within the reasonably foreseeable future, and declined to cumulate imports from Ukraine.  *See*

*Def.'s Br.* at 54-55.  The cumulation provision of the relevant statute provides that the ITC "shall not cumulatively assess the volume and effects of imports of the subject merchandise in a case in which it determines that such imports are likely to have no discernible adverse impact on the domestic industry." 19 U.S.C. § 1675a(a)(7).  In its *Final Determination*, the Commission relied on evidence that "there have been [                                                                    ] of titanium sponge from Ukraine during the period of investigation," and that significant imports of Ukraine of titanium sponge are not likely within a reasonably foreseeable time.  *Determination* at 10.  In its brief to the court, the Commission detailed the evidence upon which it relied in predicting that potential imports from Ukraine were not likely to have a discernible impact on the domestic industry.  *Def.'s Br.* at 55-58.  The Commission noted that the Ukraine producer intended to [                                              ]  and that financing for modernizing Ukraine's facilities would not be available for three years after the decision to restore domestic production was made.  Evidence was unclear whether the plant would complete modernization and reach its anticipated 6,250 metric ton capacity.  *See Determination* at 10 n. 45.  Furthermore, production at maximum capacity would not be immediate, and any further expansion would require installation of new equipment at significant expense.  *See id*.  Thus, the Commission concluded that there was little likelihood of significant Ukrainian production within the reasonably foreseeable future. As for the impact of potential imports on the domestic industry, the Commission found that Ukraine sponge had not historically been sold in the United States market, and that the likely future markets for Ukraine titanium sponge were in Ukraine and in foreign markets other than the United States.  *See Def.'s Br.* at 57.

Additionally, the ITC refutes Plaintiff's claim that it relied solely on the testimony of the Ukraine

producer in making its determination not to cumulate Ukraine imports of titanium sponge.  Defendant

states, and the court agrees,

> Plaintiff's argument ignores the substantial evidence on the record that the Commission
> relied on: a lack of imports from the Ukraine; no current production with production
> only gradually beginning over the next year, other likely markets for Ukraine sponge
> based on historical data and already received requests for future shipments; and low
> quality of Ukraine titanium sponge compared to domestic sponge.

*Def.'s Br.* at 57-58.  Finally, responding to Plaintiff's claim that the Commission failed to verify any of

the information submitted by the parties seeking revocation, the ITC correctly responds that Congress

has not required the Commission to conduct verification procedures for the evidence before it, or

provided a minimum standard by which to measure the thoroughness of a Commission investigation.

*See Atlantic Sugar*, 744 F. 2d at 1561.

In reviewing agency determinations, the court examines whether there was substantial evidence

on the record as a whole that would reasonably support the agency's conclusion.  Clearly, in this

instance, Plaintiff has not shown that consideration of the evidence on the record as a whole was

unreasonable and unsupported by substantial evidence.[12]

---

[12]Plaintiff submits two letters as exhibits to its brief, in support of its allegation that the testimony provided to the Commission by the Ukraine producer was misleading. The standard of review in this case restricts the court's review to that of the administrative record, which does not include such attachments or exhibits. *See* 19 U.S.C. § 1516a(b)(1)(B) (1994).  As such, the court will not consider these exhibits.

## V. CONCLUSION

For the foregoing reasons, the court holds that the ITC's *Determination in Titanium Sponge from Japan, Kazakhstan, Russia, and Ukraine,* USITC Pub. 3119, Inv. Nos. 751-TA-17-20 (August 1998) is supported by substantial evidence and in accordance with law.  Therefore, the court denies Plaintiff's *Motion for Judgment Upon the Agency Record.*  Judgment will be entered accordingly.


Dated: _____                              _____
        New York, NY                                              Judith M. Barzilay
                                                                         Judge